**Dr. Arie HAREL, Plaintiff,**

v.

**RUTGERS, THE STATE UNIVERSITY, President Francis Lawrence, Dr. Joseph Seneca, Defendants.**

**No. Civ. 95–5137(WHW).**

United States District Court, D. New Jersey.

April 24, 1998.

Michael Sussman, Jimmy Santos, Sussman, Bergstein & Wotorson, Goshen, NY, John Brennan, Jr., Brennan & Duncan, Spring Lake Heights, NJ, for Plaintiff.

John Peirano, Carpenter, Bennet & Morrissey, Newark, NJ, for Defendants.

## OPINION

WALLS, District Judge.

Dr. Arie Harel ("Harel") brings this civil rights action against Rutgers, the State University of New Jersey ("Rutgers" or "the University"), Dr. Joseph Seneca, Vice President for Academic Affairs ("Seneca"), and Dr. Francis Lawrence, President of Rutgers ("Lawrence"). Harel alleges that the defendants denied him tenure on account of his Israeli national origin and gender in violation of 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Defendants have moved for summary judgment. Under Fed.R.Civ.P. 78, the Court decides this motion without oral argument by counsel. For the following reasons, the Court grants summary judgment to all defendants.

### Factual and Procedural History

I. *The Parties*

Harel is an operation management scientist who was born in Liberitz, Czechoslovakia October 9, 1946. When he was six months old, he was taken to Israel[1] and became an Israeli citizen upon the declaration of that nation's statehood in 1948. In 1980, Harel came to the United States to begin doctoral studies at Columbia University. He joined

---

1. At that time, Israel had not yet become an independent nation and the territory that is now known as Israel was the British mandate of Palestine.

Rutgers as an adjunct assistant professor in September 1985 and, after receiving his doctorate degree in management science, became an assistant professor in the Quantitative Studies Department[2] at the University's Graduate School of Management in 1986 or 1987.

Defendant Seneca, the University's Vice President for Academic Affairs, served as chair of the Promotion and Review Committee during plaintiff's 1992–93 and 1994–95 tenure evaluations. Defendant Lawrence is the President of Rutgers. He opposed Harel's tenure bid on several occasions.

## II. The Tenure Evaluation Process at Rutgers

Rutgers utilizes a multi-level evaluation process to determine whether to award tenure to members of its faculty. The University Policy with Respect to Academic Promotions (the "Policy") provides that teaching, scholarship, and service should be considered in deciding whether to grant tenure:

> For general teaching/research faculty, scholarship, including research accomplishments, is the primary criterion. Excellence in scholarship . . . is necessary to the achievement of tenure; effective teaching . . . is also normally a condition for the achievement of tenure. Only in rare instances where an individual's scholarship has enabled his/her teaching to achieve national recognition, that is, to make an impressive and recognized impact on teaching in the discipline as a whole, not limited to this University, may teaching become a basis for tenure. Significant accomplishments in the activities specified under the criterion of service will strengthen a candidacy for tenure. Such accomplishments are expected in a member of the profession, but cannot replace scholarship and research or teaching effectiveness as a justification for tenure.

See John J. Peirano Certif. ("Peirano Certif."), Exh. A at 6. The Policy further provides that only "[t]hose faculty members who have made the most important contributions to the University and have discharged their duties with the greatest distinction will be considered for [tenure]. . . . Advancement to a higher rank is not automatic." Id. at 4.

The defendants contend that Harel was denied tenure because of the deficient quality of his scholarship. See Defendants' Rule 56.1 Statement ¶ 6. The Policy outlines how scholarship should be evaluated in the making of tenure decisions:

> [S]cholarship, as measured by peer recognition of its originality, impact on, and importance to the development of the field, is demonstrated most typically by refereed publications, such as journal articles and books of high quality. Scholarship and research accomplishments are also demonstrated by the design and execution of applied research in the laboratory or in the field; through the presentation of papers at organized scholarly meetings, usually at the national or international level; through the attraction of external support or competitive fellowships and awards appropriate to the faculty member's field of study; through such activities as editing, . . . the compilation of information, and the development of materials that make information more assessable to researchers, other scholars, and practitioners; and through publication in other academic or professional journals and lecturing in professional and other public forums.

Peirano Certif., Exh. A at 2. According to Ronald Armstrong, the current chair of plaintiff's department, the factors employed to assess the impact of a candidate's scholarship include: (1) the quality of the journals in which the candidate's articles appear; (2) the frequency that the works are cited; (3) whether the work is published in refereed journals; (4) whether the work is co-authored; (5) the level of recognition of the work by the candidate's peers; (6) the number of publications; (7) whether the candidate has received awards for his scholarship; and (8) whether the candidate has published on subjects beyond his dissertation topic. See Santos Certif., Exh. 2 ¶ 13.

---

**2.** The name of this department has since changed to Management Science and Computer Information Systems.

The Academic Reappointment/Promotion Instructions describe the procedures one must follow to seek tenure. *See* Peirano Certif., Exh. C.[3] The candidate prepares a promotion packet that generally consists of his/her *curriculum vitae* and additional documents and materials submitted in support of the application such as recently published works. The packet will include any confidential letters submitted by academics who are in the candidate's field outside of the University. The department chair is responsible for soliciting these required external letters of evaluation. *See id.*, Exh. C.

At the first level of the process, tenured faculty within the candidate's department review the promotion packet. The department chair may appoint a reading committee to prepare a written assessment of the candidate's scholarly work. The chair then convenes the departmental committee to discuss the candidate's qualifications and vote on the tenure bid. A positive recommendation requires approval of two-thirds of those voting. The department produces a report that reflects the majority and any minority views among the peer review group. *See id.*

The candidate's promotion packet and the departmental report are then submitted to the Dean's Advisory Committee on Appointments and Promotions ("A & P Committee"). The A & P Committee, formed of two faculty members appointed by the dean and two faculty members elected by the faculty, evaluates the promotion packet and makes a written recommendation to the dean. *See id.*

Then the dean evaluates these materials and makes his own independent recommendation of the merit of the tenure application. If his recommendation differs from that of the department, the dean must discuss the matter with the department chair before submitting his recommendation. *See id.*

If either the dean or the department favors the grant of tenure, the application materials are advanced to the Promotion Review Committee ("PRC"), which purpose is to advise the University President on appointments and promotions to positions of tenure. The PRC is chaired by Rutgers Vice President for Academic Affairs, defendant Seneca, a non-voting member. Its task is "to assure the President that the prior process of decanal judgment and peer review has integrity, in the sense that the peers in the same or adjacent fields who have expressed their judgment are indeed at the leading edge of their fields, that appropriate evidence and analysis have been presented of accomplishment and impact on the field to support these judgments, and that the dean has applied the highest, University-wide standard of quality." *See id.* at 13.

After making these assessments, the PRC forwards a written recommendation to the President, defendant Lawrence, who in turn evaluates the evidence and materials accumulated during the process and makes his own recommendation to the Board of Governors. After considering all available information, the Board makes the final tenure determination. *See id.*

### III. The Consideration of Harel for Tenure

#### A. Harel's 1990–91 Evaluation for Tenure

The University first reviewed Harel's candidacy for tenure in the 1990–91 academic year. The seven department faculty members who evaluated his promotion packet voted unanimously to recommend tenure. Four ranked his scholarship as "outstanding," one rated it as "between outstanding and above average," and two found it to be "above average." Jimmy M. Santos Certif. ("Santos Certif."), Exh. 11. The A & P Committee and the Dean also favored tenure. The PRC, however, did not recommend that Harel be promoted to the rank of associate professor with tenure because it found "insufficient evidence of peer recognition for sustained, original scholarly contributions of importance to the development of the discipline to justify promotion and award of tenure at this time." *See* Peirano Certif., Exh.

---

**3.** Harel applied for tenure in the academic years 1990–91, 1992–93, and 1994–95. The Academic Reappointment/Promotion Instructions were substantially similar in each of these years. *See* Peirano Certif., Exh. C; Jean L. Ambrose Aff., Exh. A. For the purpose of simplicity, references will be made to the 1994–95 Instructions.

H. He was ultimately denied tenure. Harel did not grieve this decision nor did he allege at that time that the adverse result was because of any type of discrimination.

### B. Harel's 1992–93 Evaluation for Tenure

Plaintiff was next considered for tenure in the 1992–93 academic year. By then, Harel had published seven refereed journal articles (three of which he co-authored) and one refereed letter to the editor, had one journal article at press, and had four works in progress (one of which he co-authored). See Peirano Certif., Exh. J. Plaintiff's scholarship focuses on his field of expertise, queueing theory. His promotion packet included fourteen letters from external evaluators who had assessed Harel's work relative to this and his previous tenure application. In the main, these letters were laudatory. Ten of these evaluators explicitly supported the promotion. See id., Exh. DD. None of the evaluators recommended against tenure. See id. One of the 1990 external evaluators remarked that Harel was "at the top of his peer group[.]" Id. But another expressed doubts concerning the creativity of his work: "While Dr. Harel's work represents quality, it is perhaps less outstanding in terms of creativity." Id. Among the distinguished scholars who submitted letters of evaluation in 1992, one referred to the plaintiff as "the number 1 expert in the study of convexity in queuing systems" while another ranked him "in the top twenty percent of Assistant Professors coming up for promotion to Associate Professor at research oriented Universities[.]" Id. Evaluators, though, generally praised his earlier work on convexity in queues more than his more recent work on polling and random walks. See id. Some of the reviewers suggested that his scholarship lacked "elegance." One noted that his results are sometimes derived from "a lot of seemingly burdensome mathematics[.]" See Santos Certif., Exh. 15. Some of the evaluators expressed concern with Harel's relatively small number of publications; one noted that he "does not have a very long publication record." See Peirano Certif.Exh. DD. However, most agreed that his works had appeared in top journals.

Dr. Nabil Adam, who had been elected to chair the department that year, appointed Dr. Michael Katehakis and Dr. Ted Szatrowski to serve as plaintiff's reading committee. These individuals previously had served on Harel's reading committee for his first evaluation in 1990–91. Harel contends that they were not qualified to serve on the committee and that their report negatively influenced his candidacy. See Santos Certif., Exh. 1 (Pl.'s Aff.) ¶¶ 146, 153. Seven department members, including Dr. Adam, voted in favor of tenure, one voted against it, and one abstained. In its positive report, the department gave Harel's scholarship an overall rating of "average to above average[.]" See Peirano Certif., Exh. K.

The A & P Committee voted unanimously to recommend Harel for tenure. The Dean, Dr. George Francis, also supported his candidacy and commented in his written recommendation that Harel's "number of publications is not great, but most of them appear in the most prestigious journals in the field." Id., Exh. L. The Dean forwarded Harel's promotion packet to the PRC. Seneca, writing for the PRC to Lawrence, recommended against tenure:

> Professor Harel's record since being appointed an Assistant Professor indicates only a moderate publication level and there is some concern about the long term significance and impact of his work. The Committee, therefore, concludes that, based on the assessment of his record, Professor Harel has not achieved a level of sustained, scholarly accomplishment to justify promotion to the rank of Associate Professor with tenure.

Id., Exh. M. President Lawrence concurred with the PRC's evaluation. Plaintiff was informed on April 6, 1993 that he had again been denied promotion. All of the evaluators involved in plaintiff's tenure consideration process in 1992–93 were males save two.

### C. Harel's 1993 Grievance

Rutgers has a collectively negotiated agreement with the Rutgers Council of the American Association of University Professors ("AAUP Agreement") that provides for

a grievance procedure "to help ensure the integrity of the reappointment, promotion, and tenure procedures; to provide a process for determining whether evaluations resulting in negative personnel actions were flawed . . . and to provide remedies in cases where defects are found." Ambrose Aff., Exh. B (AAUP Agreement). The grievance procedure permits a faculty member to contest an adverse decision on the grounds that it was the product of procedural violations, discrimination, or enmity; that a recommendation against promotion/tenure was materially inconsistent with the facts in the promotion packet; or that it was arbitrary and capricious when viewed in light of the criteria for granting promotions. If the Grievance Committee finds merit in the allegations, its sole and exclusive remedy is to order a remand. *See id.*

On August 18, 1993, Harel filed a grievance to protest the decision to deny him tenure. He made numerous complaints about his 1992–93 tenure evaluation including allegations that members of the reading committee, his department, and the PRC had acted in an arbitrary and capricious manner by not providing a rigorous and fair review of his work; that the reading committee and department reports contained material factual errors; that the department had committed material procedural violations through its failure to circulate to the reviewing bodies favorable materials submitted by Harel and its non-adherence to the established practice related to external reference letters; and that the members of the reading committee and Dr. Adam had exhibited enmity towards him. *See* Peirano Certif., Exh. D (1993 Grievance). Harel did not charge that his denial of tenure was motivated by discrimination based on either his national origin or gender.

After extensive hearings, plaintiff and the University entered into a "Remand Agreement" that required that Harel's application for promotion be returned to his department for another evaluation. In exchange, Harel agreed to withdraw all of the allegations in his grievance except those that Dr. Adam, Dr. Katehakis, and Dr. Szatrowski had demonstrated enmity in their evaluation of his candidacy. He agreed that he would not bring any future claims based on the withdrawn allegations in any future grievance or before any other forum. The Remand Agreement provided that the decision on remand would be based on the materials submitted in the 1992–93 promotion packet, a letter submitted by Harel to update the status of the listed works in progress, and a personal statement. Dr. Szatrowski would not participate in the remanded evaluation. *See id.,* Exh. N (Remand Agreement).

On June 26, 1994, the Grievance Committee issued its findings with regard to Harel's claims of enmity. The Committee concluded that Dr. Adam had not acted with enmity. Although the Committee found that Dr. Katehakis' actions were not motivated by enmity, it did find that he "negatively prejudged Harel's capabilities" and acted in an "inappropriate" manner. Peirano Certif., Exh. O at 6–7. With regard to Dr. Szatrowski, the Committee concluded that he had demonstrated enmity toward Harel through his conduct during the evaluation. The Committee unanimously agreed that Dr. Szatrowski had "guided the preparation and presentation of the Reading Committee report in a way that was calculated to produce a negative result." *Id.* at 9. The Committee found that such enmity was the only explanation for Dr. Szatrowski's decision to edit the 1990 report to eliminate positive references and for his various misrepresentations concerning the significance of Harel's work. *See id.*

D. *Harel's 1994–95 Evaluation for Tenure*

The University gave Harel a remanded evaluation during the 1994–95 academic year. In accordance with the Remand Agreement, Harel submitted an update of the scholarship section of his original promotion packet, which included two additional published articles co-authored by him, one of which had been previously listed as a work in progress. *See id.,* Exh. P. His 1994–95 promotion packet also included the grievance findings, a copy of the Remand Agreement, and the materials considered in connection with his 1992–93 candidacy.

Dr. Hannoch Levy and Dr. Ronald Armstrong were appointed to serve on plaintiff's reading committee. Dr. Levy is Israeli and Dr. Armstrong is American. The reading committee concluded that the type and number of citations to Harel's work was "impressive" and "consistent with the best new researchers in the field." His impact on the field was described as "very significant." Santos Certif., Exh. 15.

According to Dr. Armstrong and Dr. Douglas Jones, another faculty member who participated in the 1994–95 review, Dr. Adam conducted the departmental vote by secret ballot, even though such votes on personnel matters were usually conducted in an open manner. *See* Santos Certif., Exhs. 2 and 3. Four faculty members voted to recommend him for tenure, three voted against it, and one abstained. Dr. Julius Surkis, a Jewish member of the department, was in favor of Harel's promotion in 1990–91 and 1992–93 but has testified that he did not vote for him in 1994 because of "a decline in productivity in his work[.]" *Id.*, Exh. Y (Dr. Surkis' Dep.) at 16. Dr. Adam has explained that he voted against Harel because he no longer saw the "strong potential" in Harel's scholarship that he had observed in 1990. *Id.*, Exh. X. Because less than two-thirds of the department members favored Harel's promotion, the department issued a report that recommended against granting him tenure. The report failed to specifically articulate the views of those who had voted against tenure as required by the Academic Reappointment/Promotion Instructions. *See id.*, Exh. C. The University contends that explanations of the negative votes were omitted because the faculty members who opposed Harel wished to avoid any potential future "confrontation" with him. *See* Santos, Exh. 58.

The A & P Committee voted unanimously to recommend Harel for elevation and evaluated his scholarship as "outstanding." *Id.*, Exh. DD. The dean, who at that time was P. George Benson, also supported Harel's candidacy and wrote that Harel had published in "leading journals" in the field and "very few faculty ever achieve this record of publication in these journals by the time they are reviewed for tenure." *Id.*, Exh. R. Although the dean noted that other candidates may produce a higher number of publications, he concluded that Harel's "scholarly record [was] deserving of tenure and promotion." *Id.*

In a March 23, 1995 memorandum, the PRC, per Vice President Seneca, again did not recommend tenure to Harel:

In the area of scholarship, however, Professor Harel's record over this period does not demonstrate sufficiently substantial productivity and, although his contributions are respected by external peers, it is not apparent from the record that his work has had a significant national impact on developments in the field. The Committee, therefore, concludes that, based on the assessment of the record, Professor Harel has not achieved a level of scholarly accomplishment to justify promotion to the rank of Associate Professor with tenure.

*Id.*, Exh. S. President Lawrence also declined to support plaintiff's candidacy. The University notified Harel that he had again been refused tenure on April 14, 1995. Of those persons who evaluated Harel's candidacy in 1994–95, the overwhelming majority were males; the only two females had been members of the PRC.

### E. Harel's 1995 Grievance

On May 19, 1995, plaintiff filed a grievance to contest the results of the remanded evaluation. Plaintiff charged that the PRC had evaluated the materials submitted in support of his candidacy in an arbitrary and capricious manner. *See id.*, Exh. E. Harel contended that the PRC's conclusion that his scholarship lacked sufficient productivity and significant impact contradicted the findings reached at other levels of the evaluation process. *See id.* He cited the reading committee's observation that the impact of his results "is well felt" and Dean Benson's finding that his papers were widely cited "indicating that Professor Harel's work has had a significant impact on the field." Plaintiff also alleged that certain members of his department had acted in an arbitrary and capricious manner by changing from a positive vote in 1992–93 to a negative vote in 1994–95 without explanation despite the

more favorable reading committee report. In addition, he accused the University of not taking proper steps to locate two "missing" letters of Professors Richard Weber and Richard Larson in support of his 1990–91 candidacy. In his letter, Professor Larson had referred to Harel as " 'the expert' in his field." Santos Certif., Exh. 55. Lastly, Harel charged that Dr. Adam had omitted from his promotion packet on remand a positive internal letter from Professor Benjamin Avi–Itzak and had instead placed it in supplementary materials not available to the PRC for review. See Peirano Certif., Exh. E. This letter had praised Harel's scholarship and noted that his "publications on convexity results in queueing processes ... are of high quality and of great interest to an important group in the queueing theory community...." Id. Harel did not specifically assert in this second grievance that national origin or gender discriminatory animus motivated the adverse decision.

As provided for in the AAUP Agreement, the Faculty Appeals Board ("FAB"), a body consisting of appointed faculty members, is responsible for hearing grievances from remanded evaluations. See Ambrose Aff., Exh. B. If the FAB finds that there was error in the remanded evaluation, it may either order another remanded evaluation or recommend to the President that the candidate receive tenure. See id.

The FAB published its findings on June 22, 1995. It rejected plaintiff's allegations that the PRC members had acted in an arbitrary and capricious manner in the review of his materials. Although it found that "[t]he reasons for the gradual erosion of departmental support are not explained[,]" it did not conclude that the department members had acted arbitrarily or capriciously. Id., Exh. T. The FAB, however, did find that the University was "remiss" in only obtaining Professor Larson's letter in time to include it in the remand packet and never locating Professor Weber's letter of evaluation. Id. The FAB noted that the University had apparently only inquired about the existence of Professor Weber's letter in April 1995. It also found that Professor Avi–Itzak's letter had been "placed in the supplementary material packet which was not readily accessible to the PRC" during its remand evaluation. Id. The FAB report stated:

The Faculty Appeals Board feels that this candidate deserves promotion to Associate Professor with tenure. There are many disturbing facts in this case. Letters from outside reviewers have not been handled with requisite care. Timely receipt of outside letters from professors Larson and Weber, for example, might have convinced the PRC in 1990–91 to recommend promotion. This case includes documented cases of enmity, disqualification of certain individuals from the reading and the promotion process and the failure of the department to explain the erosion of its support for Professor Harel, especially in light of an outstanding reading report documenting his scholarship during the remand process. Unsubstantiated rumors with regard to professor Harel's access to confidential outside letters may have adversely influenced the 1994–95 remand vote.

Id.

Pursuant to the AAUP Agreement, plaintiff's case for tenure was submitted to President Lawrence with the FAB's recommendation. In a letter dated July 26, 1995, President Lawrence informed the plaintiff that, after reconsideration of plaintiff's promotion packet, he still believed "that the record of accomplishments presented is not sufficient to support a different conclusion." Id., Exh. U. Consequently, plaintiff's request for tenure was denied once again. In 1996. Professor Lei Lei, a female member of plaintiff's department, applied for and received tenure.

F. Harel's EEOC Charge of Discrimination

On September 13, 1995, Harel filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that he was denied tenure in 1994–95 on account of his national origin and gender. In the charge, plaintiff contends that the University applied harsher standards of review to male and Israeli tenure candidates in the Graduate School of Management.

*IV. The Present Action*

On October 6, 1995, plaintiff filed this action alleging that his denial of tenure during the 1992–93 and 1994–95 academic years violated 42 U.S.C. § 1983 by denying him equal protection of law and substantive due process as guaranteed by the Fourteenth Amendment. Plaintiff alleges that defendants Seneca and Lawrence did not support his tenure candidacy because of his Israeli national origin and that their decisions carried forward the discrimination which had occurred throughout his evaluation process. Harel contends that defendants deviated from normal procedures and employed more rigorous standards to him than were applied to non-Israeli candidates. The Complaint specifically alleges that Dr. Adam deviated from standard University evaluation procedures and attempted to sabotage his candidacy when he: (1) requested that a professor who had collaborated with Harel on an article understate plaintiff's contribution to that article; (2) failed to obtain an external recommendation letter from Dr. Nachum Finger, an Israeli scholar; (3) failed to allow plaintiff to review the list of external evaluators the department intended to contact in violation of standard departmental practice; and (4) selected unqualified individuals to serve on plaintiff's reading committee. In an affidavit submitted in opposition to the present motion, Harel also claims that Dr. Adam strayed from established procedure by, among other things, sending out a solicitation letter to external evaluators which differed in form from the normal solicitation letter used and by conducting the 1994–95 vote by secret ballot. *See* Harel Aff. ¶¶ 154–167, 262. In his original Complaint, plaintiff only alleges national origin discrimination—not gender discrimination—and only asserts a § 1983 cause of action. Plaintiff's substantive due process claim is premised on the purportedly arbitrary and capricious manner in which he was evaluated and the numerous deviations from standard procedures.

After receiving his Notice of Right to Sue letter, plaintiff filed an "Amended Complaint" on August 19, 1996 that added a Title VII gender discrimination claim. Plaintiff maintains that during the early 1990s, the University pressured the Graduate School of Management to grant tenure to more females in order to resolve the underutilization of female faculty members. Plaintiff has submitted a letter dated January 27, 1992 from President Lawrence to the Graduate School of Management indicating his concern with an "underutilization" of female faculty within the school. Santos Certif., Exh. 67. Harel also points to an "Affirmative Action Resolution" issued by the Graduate School of Management on May 15, 1992 which expressed the school's intention "to rededicate itself to the value of diversity among its faculty and to its full and vigorous pursuit in their recruiting, hiring and evaluation." *Id.* According to Harel, this affirmative action policy contributed to the decision to promote less qualified females instead of him. All defendants deny that plaintiff's gender played any role in the decision. Dr. Schnayer, the University's representative in plaintiff's two grievances, has specifically denied that affirmative action affects decisions to promote assistant professors to the position of associate professor with tenure. *See id.,* Exh. 71 (Schnayer Dep.) at 8–9.

**Legal Standard for Summary Judgment**

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *See Celotex v. Catrett,* 477 U.S. 317, 318, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *See Sound Ship Building Corp. v. Bethlehem Steel Co.,* 533 F.2d 96, 99 (3d

Cir.1976), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party.

## Analysis

### I. TITLE VII CLAIM OF GENDER DIS-CRIMINATION

#### A. *Whether the Gender Discrimination Claim Is Timely*

Defendants contend that plaintiff filed his "Amended Complaint," which adds a Title VII claim of reverse gender discrimination, in an untimely manner in violation of Title VII's limitations period and the Pretrial Scheduling Order. Defendants seek dismissal of the gender discrimination claim on this ground.

Plaintiff filed his Charge of Discrimination with the EEOC on September 13, 1995, claiming that he had been denied tenure on account of his Israeli national origin and gender. He then filed the original Complaint in this action on October 6, 1995, alleging that he had been discriminated against based on his national origin in violation of § 1983. This Court issued a Pretrial Scheduling Order that provided that "[a]ny motion to amend pleadings must be returnable not later than **May 13, 1996.**" (emphasis in original). The EEOC did not issue plaintiff his Notice of Right to Sue letter until May 21, 1996, eight days after the deadline to amend pleadings. On August 19, 1996, Harel, without seeking leave of this Court, filed the "Amended Complaint." Defendants argue that this "Amended Complaint" was not properly filed within the Title VII limitations period or within the deadline set by this Court.

Title VII plaintiffs must file their Complaint not more than 90 days after they receive statutory notice of their right to sue.

*See* 42 U.S.C. § 2000e–5(f)(1). Defendants contend that the mere filing of the "Amended Complaint" on August 19, 1996 does not constitute the bringing of a Title VII claim within this limitations period. In *Pygatt v. Painters' Local No. 277,* 763 F.Supp. 1301, 1310–11 (D.N.J.1991), the court found that where a plaintiff had a pending complaint in district court at the time that he received notice of his right to sue, "filing a motion for leave to amend a complaint constitutes the bringing of a Title VII claim within the statutory ninety-day period." *See Also Pollard v. City of Hartford,* 539 F.Supp. 1156, 1160–61 (D.Conn.1982). The problem here is that plaintiff never formally sought or received leave to amend his Complaint as required by Fed.R.Civ.P. 15(a). He simply filed the "Amended Complaint" within the ninety-day limitations period, without leave to do so.

The Court excuses plaintiff's procedural error. Defendants failed to object to the "Amended Complaint" when it was filed. Over a year later, defendants now raise the timeliness challenge. Consistent with principles of equity, the Court finds that the defendants have waived their right to object to plaintiff's failure to seek leave and have impliedly consented to the amendment by conducting discovery in connection to the gender discrimination claim over the past several months.

Moreover, had plaintiff requested leave to amend when he added the Title VII claim, the request would have undoubtedly been granted. Leave to amend a complaint should be granted freely in the absence of undue delay or bad faith on the part of the movant so long as the amendment would not be futile and the opposing party would not suffer undue prejudice. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Adams v. Gould Inc.,* 739 F.2d 858, 864 (3d Cir.1984), *cert. denied,* 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (1985). "[P]rejudice to the non-moving party is the touchstone for the denial of an amendment." *Cornell & Co. v. Occupational Safety & Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978). Defendants have made no showing of prejudice. Because Harel filed the "Amended Complaint" relatively early in

the proceeding, defendants have had ample opportunity to conduct discovery on the claim of gender discrimination and prepare for trial. And because the EEOC charge was pending at the time this suit was initially filed in 1995, defendants had notice that plaintiff might eventually bring a Title VII gender discrimination claim in addition to the § 1983 cause of action. The Title VII claim is not futile and not made in bad faith or with undue delay. Under these circumstances, the Court will not deny plaintiff the opportunity to have his gender discrimination claim decided on its merits despite his failure to comply with the procedural requirements to amend pleadings.

The Court also excuses plaintiff's noncompliance with the deadline set in the Pretrial Scheduling Order. The EEOC did not issue its Notice of Right to Sue letter until May 21, 1996, eight days after the Order's deadline for amending the pleadings. Consequently, it was impossible for the plaintiff to comply with this deadline as well as the administrative requirements of Title VII. The Court notes that in this situation, plaintiff should have moved to amend the Pretrial Scheduling Order to extend the deadline on account of the pending EEOC charge. See Fed. R.Civ.P. 16(b) (Pretrial Scheduling Orders may be modified "upon a showing of good cause). However, the Court will not preclude the gender discrimination claim based solely on counsel's procedural 'legal blunder' absent a showing of bad faith or undue prejudice."

B. *Whether Harel's Title VII Claim Regarding His 1992–93 Denial of Tenure Is Barred by His Failure to Exhaust Administrative Remedies*

Defendants contend that any claim of discrimination based on Harel's denial of tenure in the 1992–93 academic year is barred because Harel failed to bring an EEOC complaint about this initial adverse decision within the prescribed period. According to them, any alleged discriminatory conduct that occurred more than 180 days before Harel filed his EEOC charge is not actionable.

] Title VII requires a claimant to file an EEOC charge within 180 days of the allegedly discriminatory practice. See 42 U.S.C. § 2000e–5(e). Here, Harel received notice that he had been denied promotion as a result of the 1992–93 evaluation process on April 6, 1993. This began the limitations period. See Delaware State College v. Ricks, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (filing limitations period begins upon communication of the tenure decision). The pendency of a grievance, or any other method to collaterally review an adverse employment action, does not toll the limitations period. See id. at 261, 101 S.Ct. 498. Harel did not file any charge with the EEOC until September 13, 1995, almost two years after his 180–day limitations period had expired.

 While Harel does not dispute these dates, he argues that his claim of discrimination during the 1992–93 evaluation survives on the basis of the "continuing violation doctrine." The Third Circuit has acknowledged "that the filing of a timely charge is 'a requirement that, like a statute of limitation, is subject to waiver, estoppel, and equitable tolling.'" West v. Philadelphia Elec. Co., 45 F.3d 744, 754 (3d Cir.1995) (quoting Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982)). One of the judicially created equitable exceptions to the timeliness requirement is the continuing violation theory. Under this theory, "the plaintiff may pursue a Title VII claim for discriminatory conduct that began prior to the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination by the defendant." Id. To establish a continuing violation, a plaintiff must show that: (1) at least one allegedly discriminatory act occurred within the filing period and (2) the discrimination is "more than the occurrence of isolated or sporadic acts of intentional discrimination" and is instead a continuing pattern of discrimination. Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 481 (3d Cir.1997). If the plaintiff satisfies these criteria, he may recover for damages incurred as a result of the entire continuing violation, and the 180–day limitations period presents no obstacle. See id. It is undisputed that plaintiff has met the first element by alleging that his rejection in July 1995 constitutes

unlawful discrimination. Whether he satisfies the second element is more complex.

■] The Third Circuit has adopted the three factors enumerated by the Fifth Circuit in *Berry v. Board of Supervisors of Louisiana State Univ.*, 715 F.2d 971 (5th Cir.1983), to determine if a series of acts form an ongoing pattern of discrimination:

The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring ... or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most significance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Rush*, 113 F.3d at 482 (quoting *Berry*, 715 F.2d at 981).

Courts generally view two distinct decisions against promotion as discrete acts instead of an ongoing practice or policy of discrimination. *See Clark v. Commonwealth of Pennsylvania*, 885 F.Supp. 694, 703 (E.D.Pa.1995) (adverse promotional decisions made within two years on the basis of a civil service exam "were separate and distinct instances of promotions and cannot be grouped together as a continuing violation"); *Johnson v. Frank*, 828 F.Supp. 1143, 1150 (S.D.N.Y. 1993) ("Serial decisions not to promote do not themselves give rise to a continuing violation."). Plaintiff contends that the two tenure decisions constitute a continuing violation because the same discriminatory policy and practice permeated each review. He points out that, for the most part, the reviewing bodies consisted of the same people in 1992–93 and 1994–95 and that the latter decision was merely an extension of the earlier denial

because it was a remand from the previous decision.

In *Stewart v. Rutgers*, 930 F.Supp. 1034 (D.N.J.1996) ("*Stewart I*"), another court of this district addressed this issue under remarkably similar circumstances. There, the plaintiff, Stewart, alleged that Rutgers, Seneca, and Lawrence had denied her tenure on account of her race. Like Harel, she had been evaluated and denied tenure in 1992–93 based on the negative recommendation of the PRC and Lawrence. She filed a grievance and the Grievance Committee directed that a remanded evaluation occur during the 1994–95 academic year. The University again denied her tenure. In determining whether the 1993 adverse decision was time-barred, the court concluded that the adverse decisions by the PRC and Lawrence in 1993 and 1995 were "isolated incidents" and could not be considered a continuing violation. *Id.* at 1048.[4] Although the Third Circuit reversed the decision in *Stewart I* on a different ground to be explained *infra*, the court of appeals agreed with the distinct court's finding that the two tenure denials did not represent a continuing violation. *See Stewart v. Rutgers*, 120 F.3d 426, 433 (3d Cir.1997) ("*Stewart II*") ("the district court was correct in finding that any discrimination claim based on Stewart's 1992–93 tenure denial is time-barred").

■ The Court concurs with the above rationale of *Stewart I* and holds that the continuing violation theory is inapplicable to these circumstances. Although the acts were of the same nature—denial of tenure with allegations of gender and nationality discrimination—the other two *Berry* factors weigh against Harel. With regard to frequency, the plaintiff alleges two discriminatory acts during his nine year employment at the University—the two decisions not to grant him tenure. The Court views these acts as isolated employment decisions as opposed to a recurring pattern of discrimination. Importantly, the initial decision to deny him tenure in 1993 was sufficiently permanent to trigger

---

4. Stewart brought her discrimination claim pursuant to § 1983, not Title VII. The court applied the "continuing violation theory" to determine whether it should employ an equitable exception to the two-year limitations period for § 1983 actions. However, the same analysis applies to determine if claims are barred by noncompliance with Title VII's filing deadline.

his awareness of a need to assert his rights at that time. The Third Circuit has noted that a discrete event, such as a denial of a promotion, is more likely to trigger a plaintiff's duty to assert his rights than an ongoing practice such as continued harassment which involves various incidents throughout a lengthy period of time. *See West*, 45 F.3d at 756. Plaintiff received unequivocal notice of his tenure denial in April 1993; he was obligated to filed an EEOC charge within 180 days of this date. His grievance and the eventual decision to remand for another evaluation does not affect the permanence of this initial decision nor does it toll the running of the 180–day period. *See Ricks*, 449 U.S. at 258, 101 S.Ct. 498.

 It follows then that Harel's claim of gender discrimination in connection with his 1992–93 tenure denial is barred because he failed to bring this claim before the EEOC in a timely manner as required by Title VII.[5]

## C. *Whether Harel May Assert Title VII Claims Against Defendants Seneca and Lawrence*

 Seneca and Lawrence argue that they cannot be held liable under Title VII because they are individuals and not employers. Title VII prohibits "an employer" from engaging in discrimination. 42 U.S.C. § 2000e–2(a). The statute defines "employer" as "a person in an industry affecting commerce who has fifteen or more employees ... and any agent of such a person." 42 U.S.C. § 2000e(a). Plaintiff maintains that Seneca and Lawrence are "agents" covered by the statute and thus can be held individually liable. Plaintiff ignores the reality that the Third Circuit has recently directly addressed this issue. In *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1077

(3d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997), the Third Circuit explicitly adopted the approach of the majority of circuits and concluded that individual employees cannot be held liable under Title VII. This decision is obvious, binding precedent: the Court dismisses the Title VII claims against Seneca and Lawrence.

## D. *Whether Plaintiff Can Establish A Prima Facie Case of Gender Discrimination With Regard to His 1994–95 Denial of Tenure*

Because of the foregoing rulings, all that remains of plaintiff's Title VII claim is his contention that Rutgers discriminated against him during his consideration for tenure in 1994–95 because he is a male. Plaintiff relies on indirect evidence to establish his case. In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the United States Supreme Court established a framework for analyzing claims of discrimination in which the plaintiff seeks to prove his case through circumstantial evidence. Under the *McDonnell/Burdine* burden-shifting framework, the plaintiff must first make out a *prima facie* case, which raises a rebuttable inference of discrimination. *See Burdine*, 450 U.S. at 252–54, 101 S.Ct. 1089. Summary judgment will be granted if plaintiff fails to establish a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. If the plaintiff makes this initial showing, the burden shifts to the employer to "articulate some legitimate, non-discriminatory reason for [plaintiff's] treatment." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. Once the defendant offers such an explanation, the

---

**5.** The Court also notes that Harel failed to exhaust all administrative prerequisites with regard to his claims relating to the 1992–93 decision because he never brought them before the EEOC. The EEOC charge refers only to the events surrounding the 1995 decision and explicitly states that the earliest date on which the alleged discrimination occurred was on July 26, 1995. *See* Peirano Certif., Exh. F. Plaintiff also did not check the appropriate box on the form to indicate that he was complaining of a continuing

violation. *See id.* A plaintiff must first present his claim to the EEOC before commencing a Title VII action. *See Brown v. General Servs. Admin.*, 425 U.S. 820, 832, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). Harel's failure to first present his claim of discrimination with regard to the 1992–93 evaluation to the EEOC therefore precludes him from bringing any claim stemming from this initial rejection. *See Metsopulos v. Runyon*, 918 F.Supp. 851, 858 (D.N.J.1996).

plaintiff must produce evidence to show that the reasons proffered by the defendant were pretextual and "merely a fabricated justification for discriminatory conduct." *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 898 (3d Cir.) (*en banc*), cert. *dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). At all times, the burden of persuasion remains on the plaintiff to prove intentional discrimination. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

■ In the ordinary gender discrimination case brought for failure to promote, to establish a *prima facie* case, the plaintiff must establish by a preponderance of the evidence that (1) she is a member of a protected class; (2) has applied for, and was qualified for the position but was rejected despite these qualifications; and (3) similarly situated nonmembers of the protected class were treated more favorably. *See Roebuck v. Drexel Univ.*, 852 F.2d 715, 726 (3d Cir. 1988). However, this is not the typical gender discrimination case because plaintiff is a male and alleges reverse discrimination. While the Supreme Court has held that Title VII protects all groups from discrimination, not just traditionally disfavored groups, *see McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278–80, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), the significant question is whether the elements of the *prima facie* showing should be adjusted in reverse discrimination cases.

■ Although the Third Circuit has yet to address this issue, other circuits have modified the first prong of the *prima facie* case to require a plaintiff to show additional "background circumstances [that] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1017 (D.C.Cir.1981); *see also Duffy v. Wolle*, 123. F.3d 1026, 1037 (8th Cir.1997); *Harding v. Gray*, 9 F.3d 150, 153 (D.C.Cir.1993); *Livingston v. Roadway Express, Inc.*, 802 F.2d 1250, 1252 (10th Cir. 1986); *Murray v. Thistledown Racing Club*, 770 F.2d 63, 67 (6th Cir.1985). District courts in this circuit have also adopted this formulation. *See, e.g., Davis v. Sheraton Society Hill Hotel*, 907 F.Supp. 896 (E.D.Pa.

1995); *Daly v. Unicare Corp.—Township Manor Nursing Center*, No. 94–6838, 1995 WL 251385 (E.D.Pa. Apr.26, 1995); *Sanitate v. Securiguard, Inc.*, No. 91–4758, 1992 WL 366914 (D.N.J. Sept.30, 1992). This requirement substitutes for plaintiff's burden to show that he is a member of a protected class.

Courts have reasoned that to require this elevated *prima facie* showing is consistent with the historical purpose of Title VII and the rationale behind the burden-shifting framework. Congress' primary objective when it enacted Title VII was "to assure equality of employment opportunities" to those who have been traditionally discriminated against in our society. *See McDonnell Douglas*, 411 U.S. at 800, 93 S.Ct. 1817. Under the burden shifting framework, an "inference of discrimination" arises when an employer fails to promote a qualified member of a protected class. As the Supreme Court has articulated, "we presume these acts, otherwise unexplained, are more likely than not based on consideration of impermissible factors." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). No such inference, however, arises when the employee is a man or a member of a majority group. *See Harding v. Gray*, 9 F.3d at 153. Because invidious discrimination against males is rare in our society, "there is nothing inherently suspicious in an employer's decision to promote a qualified [female] applicant instead of a qualified [male] applicant." *Id.* Thus, in order to create a rebuttable inference of discrimination, males, and members of other traditionally favored groups, are required to produce additional particularized evidence, other than their status, to suggest that their employer would be inclined to discriminate against their group. The *McDonnell Douglas* court cautioned that the elements of the *prima facie* showing are "flexible" and to be adjusted to the circumstances of each case. *See McDonnell Douglas*, 411 U.S. at 802 n. 13.

The Court finds the rationale of this heightened standard persuasive, and holds that to establish his *prima facie* case, Harel must present background circumstances supporting the suspicion that Rutgers is that

unusual employer that discriminates against males when granting tenure.[6] Both parties agree in their briefs that this is the proper standard to apply. *See* Pl.'s Br. at 16; Def.'s Br. at 9. The Court recognizes that to require this additional proof may impose a difficult burden on reverse discrimination plaintiffs. However, it is not too unfairly burdensome to require plaintiffs after discovery to make an affirmative, concrete showing of circumstances that indicate that their employer tends to discriminate against members of their group. Although the pervasiveness of discrimination within our society may have decreased since the enactment of Title VII, the unfortunate reality is that discrimination against females and minorities is still sufficiently common to allow different *prima facie* evidentiary burdens for minority and majority plaintiffs. Regardless, the Court emphasizes that all plaintiffs, whatever their status, still have the same ultimate burden of proof—that is, the burden to establish by a preponderance of the believable evidence that they were discriminated against because of their status.

 The *Harding* court divided the types of "background circumstances" which might support an inference of discrimination into two categories: "(1) evidence indicating that the particular employer at issue has some reason or inclination to discriminate invidiously against [males]" and "(2) evidence indicating that there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination." *Harding*, 9 F.3d at 153. In other words, Harel may establish a *prima facie* case of reverse discrimination if he can establish either that Rutgers has a tendency to discriminate against men or that the circumstances surrounding his denial of tenure in 1995 are

sufficiently suspicious to warrant the conclusion that he was discriminated against based on his gender. Some of the factors courts have examined when analyzing whether a male or nonminority plaintiff has satisfied the "background circumstances" prong of the *prima facie* standard include the percentage of minority employees elevated to plaintiff's desired position, *see Davis v. Sheraton Society Hill Hotel*, 907 F.Supp. 896, 902 (E.D.Pa. 1995); *Murray*, 770 F.2d at 68, the proportion of the decision makers who were minorities, *see Reynolds v. School District No. 1, Denver, Colorado*, 69 F.3d 1523, 1535 (10th Cir.1995); *Davis*, 907 F.Supp. at 902, the qualifications of the minorities who received the position instead of the plaintiff, *see Duffy*, 123 F.3d at 1037; *Bishopp v. District of Columbia*, 788 F.2d 781, 786 (D.C.Cir.1986), evidence of other irregular acts of favoritism towards minority employees, *see Machakos v. Meese*, 647 F.Supp. 1253, 1262 (D.D.C. 1986), and internal and external pressures to increase diversity, *see Bishopp*, 788 F.2d at 787; *Lanphear v. Prokop*, 703 F.2d 1311, 1315 (D.C.Cir.1983).

 Harel argues that the internal pressure that was placed on the Graduate School of Management in the early 1990s to correct its "underutilization" of female faculty along with the promotion of allegedly less qualified, female Professors Lei Lei and Rosa Oppenheim are sufficient to establish that Rutgers is the unusual employer that would discriminate against males. The Court disagrees. Viewing all evidence in the light most favorable to the plaintiff, the Court assumes that Rutgers had instituted a policy to encourage the advancement of female faculty members within the Graduate School of Management. However, plaintiff has presented no evidence to indicate or to

6. The Tenth Circuit in *Notari v. Denver Water Dep't*, 971 F.2d 585 (10th Cir.1992), found that plaintiffs in reverse discrimination cases have an additional alternative that they may pursue if they cannot meet the "background circumstances" test. The *Notari* court held that a male plaintiff may establish a *prima facie* case of disparate treatment by "indirect evidence sufficient to support a reasonable probability, that but for plaintiff's status, the challenged employment decision would have favored the plaintiff." *Id.* at 590. A plaintiff who pursues this alternative

method of proof may not rely on the presumption that is implicit in the *McDonnell Douglas/Burdine* framework. This Court does not adopt this alternative because it finds that it is subsumed by the "background circumstances" test. Any evidence that would establish a reasonable probability that plaintiff would have been promoted but for his gender would also constitute "background circumstances" sufficient to establish an inference of discrimination and shift the burden to the employer to offer a legitimate, non-discriminatory reason for its decision.

suggest that any of plaintiff's evaluators relied on this policy when they denied Harel tenure in 1994–95. Plaintiff has failed to establish any nexus between a possible general effort to increase female representation on the Graduate School of Management faculty and the specific decision not to grant him tenure. Moreover, there is no evidence to suggest that such an affirmative action policy played any role in tenure decisions at the University. In 1994–95, 102 of the 134 candidates for tenure were male. Of the forty-five faculty members who received tenure, thirty-five were male, or 69%. *See* Ambrose Aff. ¶ 9. Although the female applicants were proportionately slightly more successful than the male candidates (44% of the female applicants were granted tenure while only 30% of the male applicants were successful), this alone does not demonstrate that gender was a motivating factor in the tenure evaluation process at the University. This is especially so in light of the 1992–93 tenure grants when 57% percent of the male candidates were successful while only 52% of the female applicants were granted tenure. *See id.* These statistics do not reflect a general disposition to discriminate against males.

■ Plaintiff also contends that the 1996 decision to grant tenure to Professor Lei Lei, a female in plaintiff's department, demonstrates that the University had an inclination to favor females. Harel asserts that Lei Lei was less qualified for promotion and that her scholarship was weaker than his. Wary of the Third Circuit's admonishment not to substitute our "judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure[,]" *Kunda v. Muhlenberg College*, 621 F.2d 532, 548 (3d Cir.1980), the Court has no desire, and, for that matter, is not competent to determine whether Harel was indeed more qualified to be an associate professor than was Professor Lei Lei.[7] However, the Court notes

that when Professor Lei Lei applied for tenure, she listed a significantly greater number of works in progress and at press, although she had written one fewer refereed journal article than had Harel when he was considered in 1994. *See* Santos Certif., Exh. 24. Of course, there is no way for the Court to evaluate the quality or impact of these works or to compare them to Harel's publications. With the record's evidence, no reasonable juror could find that the promotion of one female in 1996 proves that Rutgers was the "unusual employer" that would favor females in its tenure evaluation process. There is no evidence that the University applied its established criteria for granting tenure less rigorously when evaluating Professor Lei Lei than when evaluating the plaintiff.

Professor Oppenheim was the only tenured female in Harel's department during the relevant time period. Harel contends that the University applied less stringent review standards to Professor Oppenheim when it promoted her to be a full professor[8] than were applied to him during his tenure evaluation. That contention is only rhetoric. There is no evidence of the credentials of Professor Oppenheim at the time of her promotion or any evidence to compare her to similarly situated male associate professors who became full professors during this time period. Consequently, it is impossible to infer that she received favorable treatment because of her gender. Additionally, any comparison between Professor Oppenheim and the plaintiff is inapposite and irrelevant because each sought different positions at different times.

■ Other than Professors Lei Lei and Oppenheim, Harel has failed to name any other allegedly less qualified female professor who was promoted. In addition, other factors used to meet the "background circumstances" prong are not present. Twenty of the twenty-two evaluators who reviewed plaintiff's candidacy in 1994–95 were male, including Seneca, Lawrence, and the depart-

---

7. The Court is not in possession of Professor Lei Lei's full promotion packet because it apparently was not produced by the defendants during discovery. Plaintiff, though, has filed no motion to stay the disposition of this summary judgment motion pending a motion to compel the production of the packet.

8. Associate professors with tenure may seek promotion to the position of full professor at Rutgers.

ment members who voted against Harel. Although males certainly could discriminate against fellow males, a reverse discrimination plaintiff's case is generally stronger when nonmembers of his group made the challenged employment decision. *See Reynolds,* 69 F.3d at 1535. Plaintiff also has produced no evidence of any other irregular acts of favoritism towards female faculty members at Rutgers to suggest a gender bias. Because of the dearth of evidence to indicate that the University favored female professors, the Court finds that no rational juror could find sufficient background circumstances to indicate that Rutgers was the unusual employer that discriminated against males in its tenure evaluation process. Harel has failed to establish a *prima facie* case of reverse gender discrimination and his Title VII claim against the University is therefore dismissed.

## II. *SECTION 1983 CLAIM OF NATIONAL ORIGIN DISCRIMINATION*

### A. *Whether Harel's National Origin Discrimination Claim Based on His 1992–93 Tenure Denial Is Barred by the Statute of Limitations*

 Because § 1983 does not contain its own statute of limitations period, courts must apply the forum state's limitations period for personal injury torts; New Jersey's is two years. *See Goodman v. Lukens Steel Co.,* 482 U.S. 656, 660–62, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); *Wilson v. Garcia,* 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *Genty v. Resolution Trust Corp.,* 937 F.2d 899, 919 (3d Cir.1991). The limitations period for any § 1983 claim relating to Harel's denial of tenure in 1993 accrued on April 6, 1993, the date he received notice of the adverse decision. He did not file this suit until more than two years later on October 6, 1995. As decided above, plaintiff cannot escape the statute of limitations bar under the theory that his two denials constitute a "continuing violation." *See Stewart I,* 930 F.Supp. at 1048. Consequently, the § 1983

claim arising from the 1992–93 denial of tenure is time-barred and is dismissed.[9]

### B. *Whether Rutgers Is Entitled to Summary Judgment on the § 1983 Claim*

 Under § 1983, a government entity, such as Rutgers, cannot be held liable for the actions of its employees on a theory of respondeat superior. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To subject Rutgers to liability under this section, Harel must demonstrate that the alleged discrimination was the direct result of an official anti-Israeli University policy or custom. *See id.* at 694, 98 S.Ct. 2018 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edict or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). Such a policy or custom may be established in two ways. First, the actions of an individual policymaker may constitute an entity's policy. "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3d Cir.1990) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). The issue of whether an official has final policy making authority is a question of state law. *See Jett v. Dallas Independent School District,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). A single decision by such a policy-maker may constitute official policy. *See Pembaur,* 475 U.S. at 480–81, 106 S.Ct. 1292. Second, "[a] course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." *Andrews,* 895 F.2d at 1480 (quoting *Monell,* 436 U.S. at 690, 98 S.Ct. 2018).

 Harel has not produced evidence to indicate that his deprivation of tenure was a

9. Defendants also argue that plaintiff waived his right to bring any claim arising from the 1992–93 tenure denial when he signed the Remand Agreement. The Court will not address this issue because any such claim is barred by the statute of limitations.

direct result of either an official University policy or custom. Although he contends that the decisions of Seneca and Lawrence not to recommend him for tenure were based on his Israeli national origin, these decisions do not constitute official policies of the University because these administrators had no final authority to make policy for the University. Under the University's promotion procedures, the decisions of Seneca and Lawrence were mere recommendations. Only the Board of Governors was authorized to make final tenure determinations. The University cannot be held liable under § 1983 for the actions of Seneca or Lawrence, or for that matter, for the actions of any other evaluator, because to do so would be to impose liability on the prohibited theory of respondeat superior. *See Monell,* 436 U.S. at 691, 98 S.Ct. 2018. The only official policies regarding the tenure review process are in the "University Policy with Respect to Academic Appointments and Promotions" and the "Academic Reappointment/Promotion Instructions" which demonstrate no anti-Israeli bias. Plaintiff has presented no evidence to suggest an official policy of anti-Israeli sentiment.

▆▆ Moreover, Harel has not shown that the University exhibited a custom of discrimination against Israelis in the tenure evaluation process. He argues that the wrongful acts of which he complains pervaded his entire review process and do not constitute merely a single decision, but instead demonstrate a University discriminatory custom. *See* Pl.'s Br. at 21. The Court finds this argument to be an unpersuasive attempt to portray a single allegedly unconstitutional decision as a University-wide practice or custom. All the improprieties that Harel alleges infiltrated his evaluation culminated in a single final determination not to elevate him to the position of associate professor with tenure. A plaintiff must establish discriminatory actions directed at other individuals in order to demonstrate an unconstitutional custom or practice on the part of a governmental body.

In support of his allegation that Rutgers had a custom "of applying more stringent standards to the consideration of Israelis for promotion and tenure than to others[,]" Compl. at ¶ 41, plaintiff has named three Israelis who purportedly suffered such disparate treatment: Abraham Ravid, Moshe Adler, and Ron Armstrong. *See* Peirano Certif, Exh. BB (Answer to Interrogatory # 18). However, plaintiff, admits that each of these individuals has received tenure. Harel refers to the difficulties that each of these professors experienced during the process and the grievances that Ravid and Adler filed before they ultimately were promoted. Harel, though, has offered no evidence to show that these individuals' tenure considerations were infected in any manner by an anti-Israeli bias. This anecdotal evidence is insufficient to establish the widespread and well settled practice necessary to demonstrate a custom and impose liability upon the University.

Thus, the Court dismisses all § 1983 claims against Rutgers because no reasonable fact finder could conclude that plaintiff's alleged discriminatory treatment was a direct result of an official anti-Israeli University policy or custom.

C. *Whether Harel Has Presented Sufficient Evidence in Support of His National Origin Discrimination Claim Based on His 1994–95 Tenure Denial to Defeat Summary Judgment with Regard to the Claims Against Seneca and Lawrence*

▆▆ The remainder of the § 1983 equal protection claim is Harel's assertion that Seneca and Lawrence opposed his tenure bid in 1994–95 on account of his Israeli origin. To establish a § 1983 claim against Seneca and Lawrence for a denial of equal protection, Harel must prove by a preponderance of evidence that these officials purposely discriminated against him based on his national origin. *See Andrews,* 895 F.2d at 1478. Courts apply the same Title VII burden-shifting framework to equal protection claims brought under § 1983. *See Molthan v. Temple Univ.* 778 F.2d 955, 961 (3d Cir.1985).

▆▆ In *Roebuck v. Drexel Univ.,* the Third Circuit reviewed the three-step analytical framework for discrimination cases in the

tenure context. As mentioned above, first plaintiff must establish a *prima facie* case of discrimination based upon these three requirements: (1) he is a member of a protected class; (2) he applied for, and was qualified for tenure but was rejected despite the qualifications; and (3) similarly situated nonmembers of the protected class were treated more favorably. *See Roebuck*, 852 F.2d at 726. Initially, defendants contest that Harel is a member of a protected class by disputing that his true national original is Israeli as alleged. Defendants employ a technical definition of national origin and argue that because Harel and his parents were actually born in Czechoslovakia, he should not be considered Israeli.

 Defendants overly simplify the definition of one's "national origin" in the context of discrimination. The Equal Employment Opportunity Commission has given national origin discrimination an expansive definition in its regulations:

> The Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group.

29 C.F.R. § 1606.1. Although this definition applies specifically to Title VII violations, recognizing the parallel standards that govern § 1983 national origin discrimination claims, there is no reason that this Court should narrow the definition here. Moreover, the Third Circuit addressed the amorphous concept of national origin and concluded that the emphasis should be on the plaintiff's objective appearance to others, not necessarily on his ancestry or birthplace:

> We think unlawful discrimination must be based on [plaintiff's] objective appearance to others, not his subjective feeling about his own ethnicity. Discrimination stems from a reliance on immaterial outward appearances that stereotype an individual with imagined, usually undesirable, characteristics thought to be common to members of the group that shares these superficial traits.

*Bennun v. Rutgers State Univ.*, 941 F.2d 154, 173 (3d Cir.1991), *cert. denied*, 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992). In *Bennun*, the court found that although the plaintiff was born in Argentina, not in Spain, he would still be considered Hispanic for purposes of a Title VII discrimination suit based on his birth in "a Latin American country where Hispanic culture predominates, his immersion in Spanish ways of life and the fact that he speaks Spanish in [his] home." *Id.* Similarly, Harel's objective appearance likely might lead the reasonable employer to deduce that he was Israeli: he was raised in Israel; he speaks Hebrew, his first language, at home; he speaks English with a discernible accent; he remains an Israeli citizen; and he clearly identifies with his Israeli culture. *See* Harel Aff. ¶¶ 9–12. In light of these characteristics, plaintiff has at least established a genuine issue of material fact concerning whether his objective appearance would suggest that he is Israeli. Consequently, he has satisfied the first prong of his *prima facie* case.

 In failure-to-grant tenure cases, the Third Circuit has instructed that "in order to satisfy the qualifications element of the [*prima facie* case], plaintiff need only show that he was sufficiently qualified to be among those persons from whom a selection, to some extent discretionary, would be made. That is, he need show only that his qualifications were at least sufficient to place him in the middle group of tenure candidates as to whom both a decision granting tenure and a decision denying tenure could be justified as a reasonable exercise of discretion by the tenure-decision making body." *Roebuck*, 852 F.2d at 726 (quoting *Banerjee v. Board of Trustees of Smith College*, 648 F.2d 61, 63 (1st Cir.), *cert. denied*, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981)). The favorable votes that plaintiff received from many of his peers in his department during the 1990–91, 1992–93, and 1994–95 evaluations, the positive recommendations given by the A & P Committee and the Dean during these academic years, and the numerous laudatory evaluations that he received from reputable professors in his field indicate that he cer-

tainly fell at least within this "middle group" that deserved tenure consideration.

 An unsuccessful candidate may satisfy the third and final prong of his *prima facie* case "by showing that tenure positions 'were open at the time plaintiff was denied tenure, in the sense that others were granted tenure in the department during a period relatively near to the time plaintiff was denied tenure.'" *Id.* (quoting *Banerjee*, 648 F.2d at 62). Harel clearly meets this standard because the University granted tenure to a non–Israeli member of his department, Professor Lei Lei, during the year after his final denial.

 Once Harel establishes his *prima facie* case, the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for the decision. *See McDonnell*, 411 U.S. at 802, 93 S.Ct. 1817. The defendants have met this burden by asserting that Harel was denied elevation because the quantity and impact of his scholarship did not meet the University's standards to justify promotion. Seneca indicated this in the PRC memorandum that recommended against tenure. *See* Peirano Certif., Exh. S.

 Once the employer offers a non-discriminatory explanation for the action, the plaintiff has the burden to demonstrate that this reason is merely a pretext for discrimination. To defeat a motion for summary judgment, the plaintiff "must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994). Plaintiff need only present "enough evidence for a jury to find that the asserted reasons for the tenure denial were not the actual reasons, then the jury may infer that the employer actually was motivated in its decision by [national origin]; plaintiff is not required to provide independent, direct evidence of [national origin] discrimination." *Roebuck*, 852 F.2d at 726. However, Harel must establish "more than a denial of promotion as a result of a dispute over qualifications" to show pretext. *Molthan*, 778 F.2d at 962.

 In his attempt to cast doubt on the defendant's explanation, Harel points to two circumstances: (1) the substantial departures from the standard review procedures that permeated his evaluation and are outlined in the FAB's report and (2) the granting of tenure to less qualified non-Israeli candidates with a weaker scholarship record. Harel argues that the procedural irregularities that plagued his evaluation, such as the mishandling of one of his reference letters and the enmity exhibited by Dr. Szatrowski, suggest that discrimination influenced his review. Harel relies in part on *Stewart II*. In *Stewart II*, after concurring with the district court's conclusion that an action based on Stewart's initial denial of tenure in 1993 was barred by the statute of limitations, the court of appeals emphasized that, nevertheless, events surrounding that first decision were still relevant to plaintiff's claim of discrimination based on the second denial. *See Stewart II*, 120 F.3d at 433. The Rutgers Grievance Committee had found that the PRC's recommendation against awarding Stewart tenure in 1993 had been "arbitrary and capricious" and "could not have been reached by reasonable evaluators[.]" *Id.* The Committee had documented "various inconsistencies and procedural errors" within the PRC's report and had ordered a reevaluation of Stewart's tenure bid. *Id.* The Third Circuit held that the Committee's findings alone precluded the district court from granting summary judgment to the University, Seneca, and Lawrence. According to the court, the Committee's report presented "sufficient evidence upon which a jury could conclude that Stewart's 1994–95 tenure denial may have stemmed from discrimination based on race." *Id.* at 434.

 Here, however, the irregularities in the evaluation process that the FAB noted in its report, including Dr. Szatrowski's enmity, the mishandling of a reference letter, and the department's failure to adequately explain its altered opinion of Harel's qualifications in its 1994 report, all occurred at the lower levels of the hierarchical evaluation process. Furthermore, any improper methods employed

by department chair Dr. Adam cannot be imputed to defendants Seneca and Lawrence, who played no role in these early stages of review. There is no evidence to link Seneca or Lawrence to these alleged deviations from the standard consideration procedures. Although the FAB recommended Harel for tenure and apparently disagreed with the defendants' assessments of the quality and impact of his scholarship, the FAB did not go so far as to conclude that the decision to reject Harel for tenure was "arbitrary and capricious" as was the case in *Stewart II*. In fact, the FAB explicitly rejected plaintiff's allegation that the PRC members had acted in an arbitrary and capricious manner in reviewing his materials. *See* Peirano Certif., Exh. T. There is no evidence to link either Seneca or Lawrence to the documented improprieties or the alleged improper conduct of Adam. The FAB findings do not suggest that either of these defendants demonstrated any discrimination towards the plaintiff or acted in an "arbitrary and capricious" manner. Therefore, the procedural irregularities that may have infected the lower stages of review do not prevent this Court from granting summary judgment to Seneca and Lawrence in their personal capacities. That the FAB disagreed with the defendants' assessments of Harel's credentials does not satisfy the plaintiff's burden to produce evidence to indicate that the Seneca and Lawrence purposely discriminated against him on account of his Israeli national origin.

The Court is also unpersuaded by Harel's attempt to compare his own research accomplishments to other faculty members who have received tenure. It is not this Court's responsibility to "sit as a super tenure review board[.]" *Roebuck*, 852 F.2d at 731. Evaluating the quality and impact of a professor's publications in an area as complex as queueing theory is an intellectual exercise best left to that professor's peers who can more comprehensively assess the substance of the professor's works. The Third Circuit has acknowledged this and has hesitated to interfere with a university's judgments:

> [I]t is clear that courts must be vigilant not to intrude into that determination [of whether to grant tenure], and should not substitute their judgment for that of the

college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluations by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges.

*Kunda*, 621 F.2d at 548. If plaintiff had claimed that Seneca and Lawrence had applied an objective criterion in an unmistakably disparate manner to other tenure candidates, this Court may have found that such evidence raised a genuine material issue of pretext. *See id.* at 545 (it was not clearly erroneous for trial court to find as pretextual college's proffered explanation that female instructor did not receive promotion because she had not obtained a master's degree when three other male faculty members within plaintiff's department had been promoted notwithstanding their failure to obtain a degree). Instead, the plaintiff questions the defendants' evaluation of the impact of his work, a subjective judgment.

Moreover, Harel has failed to produce evidence to demonstrate that either Seneca or Lawrence clearly applied the University's promotion criteria in an inconsistent manner. This case differs from *Bennun* where the Third Circuit found that it was not clear error for the district court to view as pretextual the University's contention that it had not promoted the plaintiff because of the poor quality and insufficient quantity of his research. *See Bennun*, 941 F.2d at 177–80. Although the court there arrived at that conclusion by a comparison of the plaintiff's research accomplishments to those of another candidate who had received tenure in his department, in that case there was a stark inconsistency—the plaintiff received a lower rating for his research productivity despite the fact that he had published substantially more works than the professor who was given tenure. *See id.* at 179. There is no such obvious inconsistent application of objective criteria here. The only non-Israeli member

of plaintiff's department who received tenure during the relevant time period, Dr. Lei Lei, had produced one fewer refereed article but had significantly more works in progress at the time of her tenure bid. *See* Santos Certif., Exh. 24. This is far from the plain disparity that existed in *Bennun.*

Plaintiff's effort to compare the quantity and quality of his scholarship with that of selected professors granted tenure in other departments within the Graduate School of Management is also unavailing. This Court is no position to compare the impact of plaintiff's work in his field with the impact of the accomplishments of tenure recipients in other disciplines. That certain non-Israeli professors in other departments may have been granted tenure having published slightly fewer works is not sufficient to support a reasonable inference of discrimination based on national origin. The record does not show that Seneca or Lawrence discriminated against any other "qualified" Israeli tenure candidate or affirmatively exhibited any form of anti-Israel bias through their conduct. The three Israeli candidates to whom plaintiff refers all eventually obtained tenure, presumably with the advice of Seneca and Lawrence.

Consequently, after viewing the evidence in the light most favorable to the plaintiff, the Court concludes that "the record shows no more than a denial of promotion as a result of a dispute over qualifications" among various evaluators, including Seneca and Lawrence. *Molthan,* 778 F.2d at 962. Seneca and Lawrence were not the only critics of plaintiff's scholarship record. Although the external letters of reference were for the most part positive, some expressed concern with the number of works Harel produced. In addition, the department members who changed their vote in 1994 noted a decline in Harel's productivity and potential since his previous tenure bids. *See* Peirano Certif., Exhs. X and Y.

The Court concludes that Harel has failed to produce evidence to allow a reasonable fact finder to discredit the defendants' proffered reason for again denying him tenure in 1995. No rational juror could conclude that

Seneca and Lawrence fabricated their opinion concerning the quality of Harel's scholarship in order to camouflage their purposeful discrimination against him based on his Israeli origin. There is no evidence from which a reasonable juror could build the bridge to the circumstantial conclusion that the acts of the individual defendants were a pretext to discriminate against Harel because of his nationality. Nothing in the record suggests that his national origin was more likely than not the motivating force behind the determinations by Seneca and Lawrence. Therefore, the Court grants summary judgment to defendants Seneca and Lawrence with regard to the equal protection claim.[10]

## III. *HAREL'S SUBSTANTIVE DUE PROCESS CLAIM*

In his third and final cause of action, plaintiff alleges that "[b]y subjecting [him] to arbitrary and capricious deprivation of tenure and promotion, defendants have each deprived plaintiff of substantive due process, as guaranteed by the Fourteenth Amendment to the United States Constitution." Amended Compl. ¶ 46. The protection of substantive due process only extends to deprivations of property and liberty interests encompassed by the Fourteenth Amendment. *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The threshold issue then is whether the defendants' decision not to grant Harel tenure denied him of a "property" or "liberty" interest within the meaning of the Constitution.

The Supreme Court has found that the mere expectancy of future employment does not give rise to a constitutionally protected property interest. *See Perry v. Sindermann,* 408 U.S. 593, 603, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. To have a property interest in promotion to a particular position, the plaintiff must have more than an "abstract need" or a "unilateral expectation" to receive the advancement. *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. He must instead demon-

---

10. Because the Court dismisses plaintiff's § 1983 equal protection claims against Seneca and Law- rence, there is no need to address their argument that they are entitled to qualified immunity.

strate that he had "a legitimate claim of entitlement" to tenure. *Id.* That the University has established procedures to regulate the evaluation process does not necessarily create a property interest protected by the Due Process Clause, although violation of such procedures could give rise to a breach of contract claim. *See Kovats v. Rutgers, The State Univ.,* 822 F.2d 1303, 1314 (3d Cir.1987).

In *Varma v. Bloustein,* 721 F.Supp. 66 (D.N.J.1988), the court addressed whether Rutgers' tenure evaluation procedures created a protected property interest. The court found that the tenure criteria set forth in the University's regulations and instructions required evaluators to make various subjective judgments and that tenure appointment was far from automatic. It concluded that the guidelines set forth did not "provide the significant substantive restrictions on University discretion in tenure appointments required to create a protected property interest." *Id.* at 70. Given the subjective nature of the review process, a professor could not have "a reasonable expectation of an automatic grant of tenure[.]" *Id.* at 71.

 This Court agrees with the analysis employed in *Varma.* The University Policy with Respect to Academic Promotions specifically provides that advancement to higher positions such as associate professor with tenure "is not automatic." Peirano Certif. Exh. A at 4. To assess a candidate's accomplishments in teaching, service, and scholarship necessarily involves subjective judgment and the substantial exercise of discretion. The regulations and guidelines in no way create the type of clear, nondiscretionary "entitlement" to tenure that the Supreme Court has found to be necessary to establish a constitutionally protected property interest. Other circuits have also concluded that a university's procedures for tenure review do not create a property interest and that alleged deviations from these standards do not give rise to a due process claim. *See Dube v. State Univ. of New York,* 900 F.2d 587 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991); *Goodisman v. Lytle,* 724 F.2d 818 (9th Cir.1984); *Beitzell v. Jeffrey,* 643 F.2d 870 (1st Cir.

1981); *Kilcoyne v. Morgan,* 664 F.2d 940 (4th Cir.1981), *cert. denied,* 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982).

 Harel also has no protected liberty interest to receive tenure. The Supreme Court has rejected the concept of some general liberty interest in obtaining specific employment. *See Roth,* 408 U.S. at 573, 92 S.Ct. 2701. Plaintiff has not shown that his denial of tenure "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Id.* Nor has he produced evidence to suggest that the University has in any way damaged his "good name, reputation, honor, or integrity" so as to inhibit his ability to seek academic positions at other educational institutions. *Id.* Consequently, the decision to deny Harel tenure does not implicate a constitutionally protected liberty interest.

Because plaintiff has no such protected property or liberty interest, the defendants did no violate the Due Process Clause through their actions. Harel's substantive due process claim is also dismissed.

### Conclusion

For the foregoing reasons, the Court grants summary judgment to Rutgers, Seneca, Lawrence and dismisses all claims against them.

**SO ORDERED.**

### ORDER

This matter arises on the motion of defendants Rutgers, Rutgers President Francis Lawrence, and Dr. Joseph Seneca for summary judgment dismissing plaintiff Dr. Arie Harel's Complaint. Upon consideration of the submissions of the parties and for the reasons stated in the accompanying opinion, the Court rules as follows:

The Court **grants** defendants' motion for summary judgment and dismisses **with prejudice** all claims against them.

**SO ORDERED.**