Todd MURPHY, and Roseann
Murphy, Plaintiffs,

v.

HOUSING AUTHORITY AND URBAN
REDEVELOPMENT AGENCY OF
THE CITY OF ATLANTIC CITY, a New
Jersey municipal corporation, John Glo-
wacki; John J. McAvaddy, Jr., John P.
Whittington, And John Does 1 Through
15, Defendants.

No. CIV. A. 97–1558.

United States District Court,
D. New Jersey.

Jan. 27, 1999.

Clifford L. Van Syoc, Van Syoc Law Offices, Chartered, Cherry Hill, NJ, for Plaintiffs, Todd Murphy and Roseann Murphy.

Stephen G. Raymond, Charles A. Ercole, Montgomery, McCracken, Walker & Rhoads, LLP, Cherry Hill, NJ, for Defendants, Housing Authority and Urban Redevelopment Agency of the City of Atlantic City, John Glowacki, John J. McAvaddy, Jr., and John P. Whittington.

## OPINION

ORLOFSKY, District Judge.

This case requires this Court to examine and apply the appropriate legal standard to allegations of "reverse discrimination" on the basis of race and gender, brought by a white male employee who claims to have been victimized by his employer because of his "majority status." Plaintiffs, Todd and Roseann Murphy, his wife, have filed an Amended Complaint against Defendants, Housing Authority and Urban Redevelopment Agency of the City of Atlantic City, John Glowacki, John J. McAvaddy, Jr., and John P. Whittington, alleging three counts of unlawful reverse employment discrimination on the basis of race and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5–1 *et seq.*, and one count for *per quod* damages for loss of care, comfort, society and consortium. Defendants moved for summary judgment, contending that Plaintiffs have failed to establish a prima facie case of reverse employment discrimination, and that *per quod* damages are not cognizable in employment discrimination cases. Plaintiffs oppose the motion, contending that genuine issues of material fact preclude the entry of summary judgment. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331,[1] and 28 U.S.C. § 1367.[2]

For the reasons set forth below, I shall grant the Defendants' motion for summary judgment on Counts I, II and IV of the Amended Complaint, because Murphy cannot establish a prima facie case of unlawful reverse employment discrimination in violation

---

1. Section 1331 provides:
   The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. 28 U.S.C. § 1331.

2. Section 1367 provides, in relevant part:
   [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.... 28 U.S.C. § 1367(a).

---

*Agency of the City of Atlantic City, John Glowacki, John J. McAvaddy, Jr., and John P. Whittington.*

of Title VII or the New Jersey Law Against Discrimination ("NJLAD"), and, alternatively, because Murphy has failed to produce even a scintilla of evidence tending to show that the Defendants' proffered nondiscriminatory reasons for the adverse employment decisions were merely a pretext for invidious discrimination. In addition, I shall grant the Defendants' motion for summary judgment on Count III of the Amended Complaint, because *per quod* claims are not cognizable in cases involving claims of employment discrimination in violation of Title VII and the NJLAD, and because as a derivative claim, a *per quod* claim cannot survive if the underlying claim fails.

## I. BACKGROUND

On March 27, 1997, Todd Murphy ("Murphy") and his wife, Roseann Murphy, filed a complaint against the Defendants, Housing Authority and Urban Redevelopment Agency of the City of Atlantic City (the "Authority"); John Glowacki ("Glowacki"), the Director of Administration for the Authority; John J. McAvaddy, Jr. ("McAvaddy"), the Executive Director for the Authority; and John P. Whittington ("Whittington"), the Chairman of the Authority's Board of Commissioners (collectively, the "Defendants"), alleging causes of action for employment discrimination, as well as a *per quod* cause of action for loss of care, comfort, society, and consortium. *See* Complaint (filed Mar. 27, 1997). Subsequently, on December 31, 1997, Murphy amended the complaint to allege four counts: (1) Count I, unlawful reverse employment discrimination based on race and sex; (2) Count II, unlawful reverse employment discrimination in violation of the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5–1 *et seq.*;[3] (3) Count III, a *per quod* cause of action by Roseann Murphy for loss of companionship, society, comfort, care, service and consortium; and (4) Count IV, unlawful reverse employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").[4] *See* Amended Complaint (filed Dec. 31, 1997).

On February 13, 1991, Murphy, a white male, applied for an accounting position with the Authority. *See* Plaintiff's Amended Certification in Opposition to Summary Judgment ("Pl.Cert."), Exh. O (Employment Application, dated Feb. 13, 1991). Murphy, a graduate of Stockton State College with a major in Accounting, requested a minimum starting salary of $21,000. *See id.* After interviewing with Glowacki and the Authority's Personnel Officer, the Authority hired Murphy on March 1, 1991, as an Accounting Assistant, with a starting salary of $16,040. *See* Defendants' Brief in Support of Summary Judgment ("Def.Brief"), Exh. B (Deposition of Todd Murphy at 5, 40 (dated Jan. 31, 1998)), Exh. A (Authority Pay–Roll Records at 1). Shortly after being hired, in April, 1991, the Authority raised Murphy's salary by five percent. *See* Def. Brief, Exh. A at 1; Murphy Dep. at 9. Subsequently, in November, 1991, Murphy received an addi-

---

**3.** The NJLAD provides, in relevant part:

It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination ... [f]or an employer, because of the race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, genetic information, sex or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, or because of the refusal to submit to a genetic test or make available the results of a genetic test to an employer, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment[.]

N.J. Stat. Ann. § 10:5–12(a) (West 1998).

**4.** Title VII provides, in relevant part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).

tional $1000 raise. *See* Def. Brief, Exh. A at 1; Murphy Dep. at 10.

The Authority has promulgated policies governing the amount of a raise which can be awarded when an existing employee is promoted. *See* Pl. Cert., Exh. A (Deposition of James Walsh, at 25–29, dated Feb..17, 1998), Exh. F (Transcript of Authority Board Meeting, Executive Session, at 2–8, dated Sept. 28, 1995). At all times relevant to this case, the Authority had a policy stating that all existing employees who were promoted would receive a raise of ten percent of their present salary, or a raise bringing the promoted employee's salary to the entry level salary of the new position. *See id.;* Pl. Cert., Exhs. T (Deposition of John Glowacki, at 13, Feb. 19, 1998), and Q (Transcript of Authority Board Meeting, Closed Session, at 2, dated March 27, 1997); *see also.* Def. Brief, Exh. C (Memorandum from Murphy to McAvaddy, dated Sept. 1, 1995); Murphy Dep. at 35, 49. A promoted employee could obtain a larger raise by petitioning the Personnel Committee of the Board of Commissioners for an exception to the ten percent salary increase policy. *See* Def. Brief, Exh. C; *see also id.* Exh. D (Affidavit of John Glowacki, dated June 12, 1998); Pl. Cert., Exh. F at 2–8.

As Murphy's responsibilities increased at the Authority, his salary also increased. In early 1992, Murphy was promoted from Accounting Assistant to Full-time Accountant. *See* Def. Brief, Exh. A at 1; Murphy Dep. at 10. He received a ten percent raise. *See* Def. Brief, Exh. A at 1; Murphy Dep. at 10. In addition, in April, 1992, the Authority raised Murphy's salary by an additional five percent. *See* Def. Brief, Exh. A at 1. Eight months later, in December, 1992, the Authority gave Murphy another raise in the amount of $2,200 for taking on additional responsibilities. *See* Murphy Dep. at 12; *see also* Def. Brief, Exh. A at 1. Subsequently, in April, 1993, Murphy received an annual raise of 5.9 percent. *See* Murphy Dep. at 12.

In February, 1994, the Authority promoted Murphy to Senior Accountant; and he received a ten percent raise with the promotion. *See id.* Two months later, in April, 1994, Murphy received an annual raise of five percent. *See id.* In March, 1995, the Authority made Murphy a permanent Senior Accountant. *See id.* at 12–13.

In September, 1995, the Authority promoted Murphy once again to Supervising Accountant. *See id.* at 13. With the promotion, Murphy received a ten percent increase in salary. *See id.*

Prior to being promoted to Supervising Accountant, on September 1, 1995, Murphy sent a memorandum to the Executive Director of the Authority, McAvaddy, requesting the promotion to Supervising Accountant and also requesting an exception to the ten percent salary increase policy. *See* Def. Brief, Exh. C. Under the existing policy, upon his promotion to Supervising Accountant, Murphy's salary would be increased from $30,823.48 to $33,905.76. *See* Def. Brief, Exh. A at 1. In his memorandum, Murphy requested a raise in excess of $19,-550, to a salary level of $50,375. *See* Def. Brief, Exh. C. The requested raise equaled more than 60% of Murphy's existing salary of $30,823.48. *See id.,* Exhs. A, C. The raise would have placed Murphy at the mid-range of the salary scale for the position of Supervising Accountant. *See id.,* Exh. C. The requested raise would also have placed Murphy at a salary level above his immediate supervisor, the Authority's Comptroller, Robert Lawless, who received a salary of $40,180. *See* Murphy Dep. at 17–21; *see also* Def. Brief, Exh. D (Glowacki Aff.).

In his memorandum of September 1, 1995, Murphy listed his reasons for seeking such a large salary increase. *See id.* First, Murphy presumed that the Authority would not renew the services contract of an outside certified public accountant. *See id.* He surmised that the outside fee accountant's duties would fall to him as Supervising Accountant for the Authority. *See id.* Second, Murphy wrote:

I am also requesting to be brought up to the Mid Range of the position which is $50,375. This request would be a calculation based on the following factors:

Prior Board Resolutions regarding Mid Range Salary Adjustments

Compensation for added responsibility

Past Inequities in starting salaries

Credit for prior years of experience

I have come up with a formula which follows not only the current policy, but in fact incorporates several prior actions taken by the Board of Commissioners. These include salary adjustments for added responsibility and past inequities in starting salaries.... I am requesting an exception to the personnel policy which would allow me the opportunity to seek equity in this new position for the added responsibility and past inequities in the starting salary for my current title. The formula I have come up with is as follows.

| | |
|---|---|
| Current Salary | $30,794.14 |
| Promotion 10% | $ 3,079.41 |
| | $33,873.55 |
| Prior Years of Experience (4 years @ 5%) (Per Personnel Policy) | $ 6,774.71 |
| Value of Added Responsibilities (Past Inequities) | $ 9,726.74 |
| Mid Range of Position | $50,375.00 |

*See* Def. Brief, Exh. C. To support his request, Murphy listed five examples in which the Board of Commissioners approved salary increases in excess of 10% for other employees:

Resolution # 4866 granted Ronald Coleman[, an African–American male,] an increase in his starting salary of his new position based on past inequities. Resolution 4836 granted Deborah Mitchell[, an African–American female,] ... compensation to bring her up to Mid Range of the Director of Management title[,] ... based on "Compensation for added responsibility." Resolution # 5050 granted Charles Hargrove[, an African–American male,] a positive salary adjustment beyond the Mid Range ... based on performance and prior experience.... Rhega Taylor[, an African–American female,] not only [received] a $6,000.00 increase but then an additional $2,000.00 bonus.... Sharon Miller[, an African–American female, was granted] a $5,000.00 increase for added responsibility....

*See* Def. Brief, Exh. C. In concluding the memorandum, Murphy wrote: "[T]he information I have provided in the previous examples allows me to be brought up to the Mid

Range of the Supervising Accountant position. This is based on exceptions that I have set forth. Therefore, my request for a promotion and adjustment to the Mid Range is not uncommon." *See id.*

On September 28, 1995, the Authority's Board of Commissioners considered Murphy's request for promotion and request for an exception to the ten percent salary increase policy. *See* Pl. Cert., Exh. F (Transcript of the Authority's Board Meeting, Executive Session, dated Sept. 28, 1998). At the meeting, regarding Murphy's requests, Glowacki informed the members of the Board of Commissioners:

There is no question about this man's competence, or ability, or interest. He's one of the best employees I have. The problem is that there's—he's asking for additional money beyond what the personnel policy permits. [The][p]ersonnel policy now says, that when you're promoted you get a 10 percent increase, or, you move to the lowest [salary] level of the next job. In his case, he'll get a 10 percent increase. He was asking for consideration to take him beyond that. And, he was using as a precedent the item in our personnel policy that permits us to take new employees, when we hire them, and consider their experience and where it exceeds the minimum requirement, to give five percent for each year, beyond which, you know, their experience takes them. We never put a provision in there to enable that for people getting a promotion.... I think it's a bad move. I think as long as we have the provision in there that takes into consideration the experience at the time of hire, if a person moves on and gets promoted, that's already been considered. And, at the time of promotion there would be no need to consider it a second time. That's my opinion.

...

I'm afraid ... that if you do this in one instance you're going to have a rash of incidents. And every time somebody comes up for promotion, you're going to have to go through heart rendering [sic] discussion. And, you know, I like this guy. I would love to do and I've already promot-

ed him several times in recognition of his good work.

. . .

But I don't want to recommend it as a whole salary change and in his case I think we have to draw the line there. I know he's going to be angry but I think that's what we have to do. That's my opinion.

*See* Pl. Cert., Exh. F at 3–4.

In agreement with Glowacki, at the September 28, 1995, meeting, McAvaddy stated:

[Murphy] was using the calculations that we use for new hires. . . . And he was using that into his calculations which would have brought him up to $37,000 or $38,000. But, on top of that, he was using, for example, the things that we cited before, Mr. Hargrove's promotion[, Deborah Mitchell's] assuming other responsibilities, Rhega Taylor. . . . We knew and we mentioned it before, at some point in time, we were going to catch hell for this. We should take a stand now and say this is— you know. Again, I think, if John [Glowacki] thought that the job in this particular case . . . warrant[ed] . . . additional monies, then I think we would go—we would fight for it. But, [Glowacki] thinks that for the time that [Murphy has] been here, for the work that's involved, and . . . his supervisor[,] . . . [w]ho is not of the greatest health. If he should leave, then [Murphy] would more than likely have an opportunity to be promoted. . . . My point is: At some point, in the future, [Murphy] may be there where we can [increase his salary to the Mid Range]. But, to do this now—and, now I think is the time to take a stand. . . . [T]here is no objective way, mechanism in place for us to do this.

*See* Pl. Cert., Exh. F at 5–6.

In addition, on the issue of objective criteria, Glowacki added:

[The Authority has] never really come up with a good valid way to handle [merit increases]. And I don't believe that this is the way to do it. If at some time, we do come up with a good way, he could be considered. But, I wouldn't recommend it now.

*See id.* at 6. Finally, McAvaddy stated: "[Murphy is] a good employee. He's a hard worker. Do anything you ask him to do. Take on additional work, but . . . it's hard for us to come up with a justification that's within the purview [of the policies] that you[, the Board of Commissioners,] have given us." *See id.*

After discussing the issue of merit increases in general, and additional, unrelated personnel issues, the Board of Commissioners voted to close the executive session. *See id.* at 8–29. Subsequently, during the open session of the Board of Commissioners meeting, the Board denied Murphy's request for an exception to the ten percent salary increase policy.

Subsequent to the Board of Commissioners' denial of Murphy's request for an exception to the personnel policy, the Board renewed the contract of the outside certified public accountant. *See* Murphy Dep. at 17–18. Consequently, as the Supervising Accountant, Murphy was not required to assume the duties performed by the outside fee accountant. *See id.*

After being denied the exception to the personnel policy, Murphy talked with a number of officials at the Authority. *See* Murphy Dep. at 44–46, 55, 67. Murphy discussed the denial of the exception with James Walsh, a member of the Board of Commissioners. *See* Murphy Dep. at 55; *see also* Pl. Cert., Exh. B (Deposition of James Walsh, at 23–24, dated Feb. 17, 1998). Murphy testified that Walsh stated that "if [the Board members] were not [going to give Murphy an exception, like they had given to the other employees referenced in Murphy's memorandum], then [the Authority] was, basically, discriminating against [him]." *See* Murphy Dep. at 63. Walsh, however, testified:

Q. [I]t's your understanding that Todd Murphy was supposed to be receiving the mid range salary [for the position of Supervising Accountant]?

A. No.

. . . [Murphy] thought[ ] that he was supposed to be at the mid range of the new title.

Q. Did you agree with that from what you understood the policy to be?

A. No.

... The policy didn't address employees.

Q. Existing employees?

A. Existing employees. That was the gist of the whole thing. If Todd walked out the door and walked back in again, he was eligible for the mid range.

*See* Walsh Dep. at 28–29.

Murphy also discussed the Board's denial of his exception with Board member, Terry Perry. *See* Murphy Dep. at 67. Perry informed Murphy that Glowacki and McAvaddy "showed her the information that they requested [Murphy] present to them[, the memorandum dated September 1, 1995], and that is what they presented to her." *See id.*

In addition, Murphy testified:

Q. Did anyone at the Authority ever say that you were not getting the exception because you were the wrong color, or because you were not black?

A. What do you mean "anyone?"

...

Q. You said ... that Mr. Glowacki said that you're not in the same political position [as the employees listed in your memorandum of September 1, 1995]?

A. Correct.

Q. Do you have any other statements that anybody ever said to you?

A. Not directly. But that statement right there, in my opinion, clearly stands out. Why would somebody say something like that?

Q. So, you interpret the phrase, "same political position," to mean because you're not black?

A. I don't know exactly what he was thinking, but I got the general idea that that's what he was leaning towards.

Q. Why do you think that?

A. Well, if you look at all of the people that I have mentioned [in my memorandum] and the people that have gotten the substantial exceptions, they're all black.

...

Q. Why do you think you should be paid the Mid Range?

A. Because of the exceptions that they've made, and the people that I have indicated in the Complaint.

Q. ... Other than the statement that you allege that Mr. Glowacki said to you that you were not in the same political position as some of these other people, are there any other statements that you relied on?

A. I don't recall other statements, but that one really sticks in mind.

...

Based on what I have seen, the salary exceptions, as you will, the fact that they did those and the statement was made that I am not in that political position just led me to believe that because of my position now, or I am not in the same position then, I was being denied ... more than the ten percent.

*See* Murphy Dep. at 40–41, 53–54.

Murphy listed other African–American employees who allegedly received preferential raises from the Authority: "Ronald Lewis, who received a twenty-nine percent increase; Izetta James, who received a twenty-five percent increase; and Dianna Rollins, who received a forty-three percent increase...." *See* Pl. Cert., ¶ 11.

In addition to the denial of the exception to the ten percent salary increase policy, Murphy alleges that the Authority discriminated against him by denying his request to take municipal accounting courses at the Authority's expense. *See* Amended Complaint, ¶ 6; *see also* Pl. Cert., ¶ 20. On August 29, 1994, Murphy requested that the Authority pay for his tuition for a course entitled Municipal Finance Administration. *See* Pl. Cert., ¶ 20; Glowacki Dep. at 39–51; *see also* Defendants' Reply Brief, Exh. A (Memorandum from Murphy to Glowacki, dated Aug. 29, 1994). Glowacki denied Murphy's request because Glowacki determined that having Murphy take the course would not be beneficial to the Authority. *See* Glowacki Dep. at 42–43, 46. Specifically, Glowacki testified:

Q. So, it would be your claim you did not [deny the request to attend the Municipal Finance Administration course] arbitrarily or capriciously; right?

A. Yes.

Q. Tell us about the process [you employed in denying Murphy's request].

A. Look at the—the courses that are being requested, determine what value it has to the Authority, does [the Authority] need it; and, if it doesn't, say no. . . . Or, if it's needed, say yes. . . . And if I said yes, it would then go to the executive director for final approval.

. . .

Q. So you mentioned that you discussed [the course with Murphy,] and [he] told you he wants to get his municipal financing credentials. Did you then respond to him in some way by saying, "You don't need that," or anything else?

A. I told him I didn't think it was necessary [because "[m]unicipal accounting is not what we do at the [A]uthority."]

*See* Glowacki Dep. at 42–43, 46.

Murphy contends that although "Glowacki testified that [Murphy] would not benefit from the municipal finance course; [Glowacki] nevertheless [approved the course for] three black individuals, Theresa Thompson, Rosalyn Wooding and Robert Campbell. . . ." *See* Pl. Cert., ¶ 20. When questioned about these three employees, Glowacki testified that the Municipal Finance Administration course "might have been part of an overall grouping for the Purchasing Department to which we sent several people[,]" including these three employees. *See* Glowacki Dep. at 51. When asked if the race of the three employees had "anything to do with them being permitted to take the course[,]" Glowacki responded "[n]ot hardly, because everybody in Purchasing is Black[;] . . . [I] sent the people that were there, [and] they happened to be Black." *See id.* at 52.

On the issue of the Municipal Finance Administration course, Glowacki further testified:

Q. Now, it's clear in your mind that Miss Thompson's race being Black was not a reason she was allowed to go and Mr. Murphy was not allowed to go; is that right?

A. Very clear in my mind.

Q. Can you give me all the other reasons, all nonracial reasons that you're aware of, which permitted [Thompson] to go at the Authority's expense but precluded Mr. Murphy from going at the Authority's expense? . . .

A. People in Purchasing differ from someone who has a degree where the major is Accounting[, like Murphy]. If I recall correctly, [Thompson's] background was . . . in teaching, so . . . it would benefit her to know a little bit about [municipal finance].

. . . That's why she was permitted to go.

Q. All right. Any other reasons?

A. That's about it.

Q. . . . Why did you determine that Mr. Murphy would not benefit from the same course?

A. Because he already had the accounting courses necessary for the work he was performing.

. . .

[And] I had intended to send him to the course that was specific to HUD [accounting].

. . .

[The Authority] wouldn't benefit from [sending Murphy to] the [municipal finance] course. . . .

*See* Glowacki Dep. at 54–55.

On November 26, 1996, Murphy filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). *See* Pl. Cert., ¶ 18. On March 26, 1997, Todd and Roseann Murphy filed a complaint in this Court against the Defendants alleging unlawful reverse employment discrimination and a *per quod* cause of action for loss of care, comfort, society and consortium. *See* Complaint (filed Mar. 26, 1997). Subsequently, on October 3, 1997, the EEOC issued Murphy a right to sue letter. *See* Pl. Cert., Exh. A (Right to Sue Letter, dated Oct. 3, 1997). With Defendants' consent, Murphy filed an Amended Complaint on December 31, 1997 alleging four counts. *See* Amended Complaint (filed Dec. 31, 1997); *see also* Stipulation of the Parties (filed Dec. 31, 1997). Three of the four counts alleged unlawful reverse employment discrimination on the basis of race and sex, in violation of Title VII and the NJLAD. *See* Amended Complaint,

Counts I, II, IV. The fourth count alleged a *per quod* cause of action on behalf of Rose-ann Murphy. *See* Amended Complaint, Count III. Defendants filed a timely answer to the Amended Complaint. *See* Answer (filed Jan. 26, 1998). On August 17, 1998, Defendants filed this motion for summary judgment on all counts of the Amended Complaint. *See* Defendants' Notice of Motion for Summary Judgment (filed Aug. 17, 1998).

In support of their motion for summary judgment, Defendants contend: (1) that Murphy has failed to make a prima facie case of unlawful reverse employment discrimination; (2) that Glowacki and McAvaddy are entitled to the "same actor" defense; and (3) that Murphy failed to pursue his administrative remedies before the EEOC, thus rendering his Title VII claim untimely. *See* Def. Brief at 7. Defendants further contend that Roseann Murphy's *per quod* cause of action must be dismissed, because loss of consortium damages are not recoverable in employment discrimination actions brought under Title VII and the NJLAD, and because Roseann Murphy admitted that she did not suffer any injuries as a result of the Authority's adverse employment decisions. *See* Def. Brief at 15. In opposition to the motion, Murphy contends that numerous disputes of material fact remain, precluding this Court from granting Defendants' motion for summary judgment. *See* Plaintiff's Brief in Opposition to Summary Judgment ("Pl.Brief") at 6–14 (filed Aug. 17, 1998).

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Reitz v. County of Bucks,* 125 F.3d 139, 143 (3d Cir.1997); *Hersh v. Allen Prod. Co.,* 789 F.2d 230, 232 (3d Cir.1986). In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See, e.g., Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.

1995); *Hancock Indus. v. Schaeffer,* 811 F.2d 225, 231 (3d Cir.1987).

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material fact remains. Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion ...; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *see also Lujan v. National Wildlife Fed.,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("The object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit."); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992) ("[T]o raise a genuine issue of material fact ... the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather must exceed the " 'mere scintilla' threshold."), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). If the non-moving party fails to oppose the motion by written objection, memorandum, affidavits and other evidence, the Court "will accept as true all material facts set forth by the moving party with appropriate record support." *Anchorage Assocs. v. Virgin Islands Bd. of*

*Tax Rev.*, 922 F.2d 168, 175 (3d Cir.1990) (quoting *Jaroma v. Massey*, 873 F.2d 17, 21 (1st Cir.1989)).

Even where the non-moving party has failed to establish a triable issue of fact, summary judgment will not be granted unless "appropriate." Fed.R.Civ.P. 56(e); *see Anchorage Assocs.*, 922 F.2d at 175. Rule 56(e) of the Federal Rules of Civil Procedure requires that the case be evaluated on its merits, with summary judgment being granted for the movant only if they are entitled to a judgment as a matter of law. *See Anchorage Assocs.*, 922 F.2d at 175.

## III. DISCUSSION

### A. Unlawful Reverse Employment Discrimination

■ Murphy alleges claims for unlawful reverse employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the NJLAD, N.J. Stat. Ann. § 10:5–1 *et seq. See* Amended Complaint, Counts I, II, IV.[5] The prima facie elements of employment discrimination are the same for claims under Title VII and the NJLAD.[6] *See Erickson v. Marsh & McLennan Co., Inc.*, 117 N.J. 539, 549, 569 A.2d 793 (1990). In addition, the analytical framework, known as the shifting burden standard, developed by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to both Title VII and NJLAD claims for employment discrimination. *See Erickson*, 117 N.J. at 549, 569 A.2d 793; *see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dept. of Com-*

*munity Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668)); *Ditzel v. University of Medicine and Dentistry of New Jersey*, 962 F.Supp. 595, 603 (D.N.J.1997) (Walls, J.).

■ Specifically, Murphy claims that he was treated less favorably than others similarly situated on the basis of race and sex, *i.e.*, a disparate treatment, employment discrimination claim. *See* Amended Complaint. A disparate treatment violation is made out when an employee from "a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion . . . ." *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir.1990). Generally, in Title VII and NJLAD cases, a prima facie case of employment discrimination is established when the plaintiff demonstrates: (1) that he or she is a member of a protected class; (2) that he or she was qualified for the job; (3) that he or she was negatively affected by the defendant's employment decisions; and (4) that he or she was treated less favorably than employees not within the protected class. *See generally, Hicks*, 509 U.S. at 506 113 S.Ct. 2742; *see also* 1 Barbara Lindemann & Paul Grossman, Employment Discrimination Law at 15 (3d ed.1996) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802 n. 13, 93 S.Ct. 1817, *and Burdine*, 450 U.S. at 253–54 n. 6, 101 S.Ct. 1089) (noting that the factors a district court must consider to determine if a plaintiff has established a *prima facie* case are flexible and must be tailored to the specific factual circumstances and claims

---

**5.** In Count I of the Amended Complaint, Murphy alleges a claim for unlawful reverse employment discrimination. *See* Amended Complaint, Count I. Unlike Counts II and IV, however, in Count I, Murphy does not state the legal basis for his claim. *See id.* Because Counts II and IV allege claims for unlawful reverse employment discrimination in violation of the NJLAD and Title VII, the only other legal ground for Murphy's claim in Count I is a 42 U.S.C. § 1983 claim for employment discrimination in violation of the Fourteenth Amendment. Because the standard for constitutional claims of employment discrimination is the same as the standard applied to NJLAD and Title VII employment discrimination claims, *see Duffy v. Wolle*, 123 F.3d 1026, 1036–37 (8th Cir.1997); *Richmond v. Board of Regents*

*of Univ. of Minnesota*, 957 F.2d 595, 598 (8th Cir.1992), I shall analyze Counts I, II and IV simultaneously under the standard for reverse discrimination claims set forth in the text above.

**6.** The prerequisites for bringing a claim for unlawful reverse employment discrimination, however, are not the same under Title VII and the NJLAD. Under Title VII, a plaintiff must exhaust his administrative remedies before the EEOC, prior to filing a civil action. There is no such exhaustion requirement under the NJLAD. For the reasons set forth in Section III.A–B, above, I need not address the dispute of fact surrounding the timing of Murphy's EEOC complaint. *See also* note 8 *infra*.

alleged)). In considering these prima facie elements, "an 'inference of discrimination' arises when an employer fails to [hire, promote, or otherwise provide equitable compensation to] a qualified member of a protected class." *See Harel v. Rutgers, The State University*, 5 F.Supp.2d 246, 264 (D.N.J.1998) (Walls, J.). Courts presume that "these acts, otherwise unexplained, are more likely than not based on consideration of impermissible factors." *Harel*, 5 F.Supp.2d at 264 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)).

■■■ In cases involving claims of reverse discrimination, however, "[n]o such inference ... arises [because] the employee is a man or a member of a majority group." *Harel*, 5. F.Supp.2d at 264 (citing *Harding v. Gray*, 9 F.3d 150, 153 (D.C.Cir.1993)). Title VII and the NJLAD, however, prohibit racial and gender discrimination against all people, including members of the majority. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *see also Erickson*, 117 N.J. 539, 569 A.2d 793. "Because invidious discrimination against [white] males is rare in our society, there is nothing inherently suspicious in an employer's decision [which adversely affects such an employee]." *Harel*, 5 F.Supp.2d at 264. Thus, given that the prima facie elements established by the Supreme Court require a plaintiff to be within a "protected class," to address this "square-peg round-hole problem" raised by reverse discrimination cases, the first prong of the prima facie case must be tailored to the specific factual circumstances and claims of this case. *See Daly v. Unicare Corp.*, 1995 WL 251385, at *6.

"Although the Third Circuit has yet to address this issue, other circuits have modified the first prong of the prima facie case to require a plaintiff to show additional background circumstances that support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Harel*, 5 F.Supp.2d at 264 (quoting *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1017 (D.C.Cir.1981); and citing *Duffy v. Wolle*, 123 F.3d 1026, 1037 (8th

Cir.1997); *Harding v. Gray*, 9 F.3d 150, 153 (D.C.Cir.1993); *Livingston v. Roadway Express, Inc.*, 802 F.2d 1250, 1252 (10th Cir. 1986); *Murray v. Thistledown Racing Club*, 770 F.2d 63, 67 (6th Cir.1985)). District Courts in this Circuit have adopted the "background circumstances" standard. *Harel*, 5 F.Supp.2d at 264; *accord Davis v. Sheraton Society Hill Hotel*, 907 F.Supp. 896 (E.D.Pa.1995); *Sanitate v. Securiguard, Inc.*, 1992 WL 366914 (D.N.J.Sept.30, 1992); *Daly v. Unicare Corp.*, 1995 WL 251385, at *3–5 (E.D.Pa.1995) (stating that "[t]he district courts within this Circuit ... have largely revised the prima facie case standard in reverse discrimination suits to require evidence of 'background circumstances' "); *see Erickson*, 117 N.J. at 549, 569 A.2d 793 (NJLAD case); *Bergen Commercial Bank v. Sisler*, 307 N.J.Super. 333, 704 A.2d 1017, 1023 (App.Div.1998) (NJLAD). In the absence of definitive guidance from the Third Circuit, I too shall apply the "background circumstances" standard to Murphy's claims of unlawful reverse employment discrimination.

■■ "In a reverse discrimination case [based on disparate treatment], a prima facie case is established upon a showing [ (1) ] that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority; and ... [ (2) ] that the employer treated similarly situated employees differently because of their race [or sex]." *Oakley v. Wianecki*, 1998 WL 329266, at *7 (D.N.J. June 18, 1998) (Wolin, J.) (quoting *Murray*, 770 F.2d at 67) (internal quotations omitted).

"[T]he types of 'background circumstances' which might support an inference of [reverse] discrimination [fall] into two categories: (1) evidence indicating that the particular employer at issue has some reason or inclination to discriminate invidiously against [the majority;] and (2) evidence indicating that there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination." *Harel*, 5 F.Supp.2d at 265 (quoting *Harding*, 9 F.3d at 153) (citations omitted). As noted by Judge Walls in *Harel*:

In other words, [the plaintiff] may establish a prima facie case of reverse discrimi-

nation if he can establish either that [the employer] has a tendency to discriminate against [whites or] men or that the circumstances surrounding his denial [of the exception to the personnel policy and/or the denial of his course request] are sufficiently suspicious to warrant the conclusion that he was discriminated against based on his [race or] gender.

5 F.Supp.2d at 265.

■ If the plaintiff successfully establishes a prima facie case of reverse discrimination, "the burden of production shifts to the defendant to articulate some legitimate, non-discriminatory reason for the [adverse employment action]." *Ludovico v. U.S. Healthcare, Inc.,* 1997 WL 288592, at *7 (E.D.Pa.1997) (reverse discrimination case) (citing *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1066 (3d Cir.1996)).

If the defendant successfully proffers a legitimate, nondiscriminatory reason for its employment decision, the plaintiff must show that the employer's stated reason is merely a pretext for unlawful discrimination. *Sheridan,* 100 F.3d at 1067. "[T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions." *Sheridan,* 100 F.3d at 1067 (citations omitted). As the Third Circuit observed in *Fuentes v. Perskie,* 32 F.3d 759 (3d Cir.1994):

> To discredit the employer's proffered reason ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence, and hence infer that the employer did not

act for the [stated] non-discriminatory reasons.

*Id.* at 765 (citations, internal quotations, and original emphasis omitted); *see generally, Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407.

1. *Background Circumstances*

    a. Race Discrimination

Murphy has failed to establish a prima facie case of unlawful reverse employment discrimination on the basis of race. Even assuming that Murphy was treated differently than other similarly situated employees of different races, he has failed to show "that background circumstances support[ ] the suspicion that the [Authority] is that unusual employer who discriminates against the majority[.]" *Harel,* 5 F.Supp.2d at 264–65; *Harding,* 9 F.3d at 153.

■ First, Murphy has failed to direct this Court's attention to any "evidence indicating that the [Authority] has some reason or inclination to discriminate invidiously against [the majority.]" *See Harel,* 5 F.Supp.2d at 265 (citing *Harding,* 9 F.3d at 153). To the contrary, the evidence in the summary judgment record clearly demonstrates that Murphy, a white male, was repeatedly promoted within the Authority, that Murphy received numerous raises consistent with the Authority's personnel policies, and that both Glowacki and McAvaddy considered Murphy to be an exemplary employee. *See* Def. Brief, Exh. A; *see also* Pl. Cert., Exh. F. Specifically, at the Board of Commissioner's meeting on September 28, 1995, Glowacki stated that "[t]here [was] no question about [Murphy's] competence, or ability, or interest. [Murphy is] one of the best employees I have." *See* Pl. Cert., Exh. F. at 2. In addition, at the same meeting, McAvaddy informed the Board of Commissioners that, given the poor health of Robert Lawless, Murphy was in line to be promoted to Comptroller of the Authority. *See id.* at 5.

This Court cannot reasonably conclude that while Glowacki and McAvaddy considered Murphy an outstanding employee who eventually would assume the highest accounting position at the Authority, they were also conspiring to discriminate invidiously against

him because of his race. Such an inference from the evidence of record is particularly unreasonable, given that Glowacki and McAvaddy hired Murphy, recommended him for numerous promotions, and praised him before the Board of Commissioners. Moreover, Glowacki is of the same race and gender as Murphy. *See Ditzel,* 962 F.Supp. at 604 (stating that "this Court ... is skeptical that plaintiff, a white male, can establish that he suffered reverse race discrimination at the hands of his white supervisor").

Furthermore, the evidence upon which Murphy does rely does not indicate that the circumstances surrounding the denial of the exception to the personnel policy or the denial of his course request are sufficiently suspicious to warrant the conclusion that Murphy was the victim of racial discrimination. *See Harel,* 5 F.Supp.2d at 265 (construing *Harding,* 9 F.3d at 153). Regarding the exception to the personnel policy, each of the African–American employees identified by Murphy received raises either consistent with the personnel policy, for taking on additional responsibilities, for prior experience, or to correct past inequities in their compensation. *See* Murphy Dep. at 45–47; Def. Brief, Exhs. A, C.

For example, after Ronald Lewis was promoted he received a 29% increase in salary. *See* Pl. Cert., ¶ 19; *see also* Pl. Cert., Exh. Q at 2. This substantial increase was consistent with the ten percent salary increase policy, not an exception to it. The policy stated that upon promotion an employee would receive a ten percent increase in salary, or an increase to bring the employee's salary up to the entry level salary for the new position, whichever is higher. *See* Pl. Cert., Exh. Q at 2. In the case of Lewis, the 29% increase in salary was necessary to bring him up to the entry level salary for his new position. *See id.*

In addition, each of the other African–American employees, Deborah Mitchell, Charles Hargrove, Rhega Taylor, Ronald Coleman, and Sharon Miller, received raises for taking on additional responsibilities, past inequities or prior experience. *See* Def. Brief, Exhs. A and C. Murphy also received such raises. *See* Def. Brief, Exh. A. Murphy received raises of $1,000 and $2,200 for taking on additional responsibilities. *See id.; see also* Murphy Dep. at 48–49.

In his memorandum of September 1, 1995, Murphy stated that he was entitled to a raise of more than 60% based on the personnel policies, precedents, additional responsibilities, past inequities, and prior experience. *See* Def. Brief, Exh. C. As Glowacki explained before the Board of Commissioners on September 28, 1995, Murphy's prior experience had already been considered by the Authority at the time his starting salary had been set in March, 1991. *See* Pl. Cert., Exh. F at 3. Presumably, Murphy felt that the Authority's failure to credit his past years of experience in 1991 constituted "past inequities" in 1995. *See* Def. Brief, Exh. C. Furthermore, Murphy was never required to undertake the added responsibilities of the outside fee accountant, because the fee accountant's contract was subsequently renewed by the Authority. *See* Murphy Dep. at 17–18. Moreover, the personnel policy which permitted new employees to be placed at the mid range of the salary scale for their new position, did not apply to existing employees, like Murphy. *See* Walsh Dep. at 27–28; *see also* Pl. Cert., Exh. F at 2–5.

█ With regard to Glowacki's refusal to send Murphy to the Municipal Finance Administration course at the Authority's expense, I similarly conclude that the evidence does not support an inference of reverse discrimination. Glowacki testified that the Authority sent three employees from the Purchasing Department to a series of courses, one of which happened to be Municipal Finance Administration. *See* Glowacki Dep. at 51. He further testified that the Purchasing Department employees were sent to the courses to give them background knowledge in the field of accounting. *See id.* at 51–52. The fact that the Purchasing employees were all African–American was mere coincidence, because all of the employees in the Purchasing Department were African–American. *See id.* at 52. This fact, coupled with Glowacki's testimony that Murphy's attendance of the course would not benefit the Authority, because of his extensive knowledge of accounting, leads me to conclude that

"the circumstances surrounding [the denial of Murphy's course request] are [not] sufficiently suspicious to warrant the conclusion that [Murphy] was discriminated against based on his [race]." *Harel,* 5 F.Supp.2d at 265; *see also* Glowacki Dep. at 44, 46, 51–52.

█ Finally, the only evidence which even remotely demonstrates the existence of a possible discriminatory animus is Glowacki's alleged statement that Murphy was "not in the same political position" as the employees listed in Murphy's memorandum of September 1,1995. *See* Murphy Dep. at 41–42. This cryptic statement, however, is insufficient to demonstrate that the Authority is the type of unusual employer who discriminates against the majority. *Cf. Eaves v. Runyon,* 86 F.3d 1155, 1996 WL 279174, at *1 (6th Cir. May 23, 1996) (stating that company wide "Newsbreak" that it was the employment policy of the employer to protect "historically vulnerable people" was insufficient to raise inference that the employer discriminates against the majority); *cf. Komac v. Gordon Food Service,* 3 F.Supp.2d 850, 855 (N.D.Ohio 1998) (stating that an "isolated ambiguous remark is not sufficient to create a genuine issue of material fact so as to preclude summary judgment in favor of the defendant"); *cf. also Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 314 (6th Cir.1989) (stating that single remark by plaintiff's immediate supervisor was insufficient to defeat motion for summary judgment in age discrimination in employment case).

Accordingly, I find that Murphy has failed to establish a prima facie case for reverse racial discrimination, because he has not shown "that background circumstances support[ ] the suspicion that the [Authority] is that unusual employer who discriminates against the majority[.]". Therefore, I shall grant the Defendants' motion for summary judgment on Counts I, II and IV of the Amended Complaint in so far as these counts allege employment discrimination on the basis of race.

b. Gender Discrimination

For the same reasons as set forth in Section IV.A.1.a, above, I conclude that Murphy has failed to establish a prima facie case for unlawful reverse discrimination on the basis of gender. The record is completely devoid of any evidence of gender discrimination. Aside from the allegations of the Amended Complaint, there is nothing in the record that could reasonably support an inference of reverse gender discrimination. *See* Amended Complaint, Count I.

It is well established that the non-moving party must go beyond the pleadings to demonstrate a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *see also* Fed.R.Civ.P. 56(e). On the issue of reverse gender discrimination, Murphy has not pointed to any evidence in the summary judgment record tending to demonstrate a gender discriminatory animus on the part of the Defendants.

Accordingly, I find that the evidence contained in the summary judgment record does not establish a prima facie case for reverse discrimination based on gender. Therefore, I shall grant the Defendants' motion for summary judgment on Counts I, II and IV of the Amended Complaint in so far as these counts allege employment discrimination on the basis of gender.

2. *Pretext*

Even if this Court were to find that Murphy had established a prima facie case of unlawful reverse employment discrimination on the basis of his race and gender, the Defendants would still be entitled to summary judgment on Counts I, II and IV of the Amended Complaint. The Defendants have "articulated some legitimate, non-discriminatory reason for the [denial of the exception to the personnel policy and the denial of Murphy's course request]." *See Ludovico,* 1997 WL 288592, at *7 (citing *Sheridan,* 100 F.3d at 1066). Murphy, however, has failed to "point to some evidence ... from which a factfinder could reasonably ... believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the [Authority's] actions." *Sheridan,* 100 F.3d at 1067 (citations omitted).

As stated earlier, regarding each of the African–American employees who Murphy claims were treated more favorably by the Authority, the Defendants have stated that

these employees were given raises consistent with established personnel policies, for taking on additional responsibilities, for past inequities in salary, for prior experience, or because they were new hires not subject to the ten percent salary increase personnel policy. *See* Def. Brief, Exhs. A and C; Pl. Cert., Exhs. F and Q. In addition, in denying Murphy's request for a raise of more then 60%, the Authority determined that Murphy's experience, the work required by the position of Supervising Accountant, and the personnel policies and precedents did not warrant such a substantial increase in salary. *See* Pl. Cert., Exh. F at 2–6. Furthermore, regarding those Purchasing Department employees who were permitted to attend the Municipal Finance Administration course, the Defendants have stated that these employees were sent to the course to obtain background knowledge in the field of accounting, and that the fact that they were all African–American was mere coincidence, because all of the employees in the Purchasing Department were African–American. *See* Glowacki Dep. at 52, 54–55.

Because the Defendants have articulated legitimate, non-discriminatory reasons for the adverse employment actions, to avoid summary judgment, Murphy must demonstrate, through evidence in the record, "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [Defendants'] proffered legitimate reasons for [their] action[s] that a reasonable fact finder could find them unworthy of credence...." *Fuentes*, 32 F.3d at 765; *see generally, Hicks*, 509 U.S. at 512–13, 518–19, 113 S.Ct. 2742. Murphy has failed to make this demonstration. The record contains no evidence from which a reasonable factfinder could determine that the Authority's proffered explanations for the adverse employment actions were a mere pretext for invidious discrimination. *See Sheridan*, 100 F.3d at 1067; *see generally, Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407.

Murphy's certification in opposition to Defendants' motion for summary judgment does little more that "replace conclusory allegations of the complaint ... with conclusory allegations of [the certification]." *Lujan*, 497

U.S. at 888, 110 S.Ct. 3177. Although, Murphy repeatedly questions the veracity of the Defendants' testimony in his certification in an attempt to demonstrate the existence of a disputed issue of material fact, many of the disputed facts are irrelevant to the issues of gender and race discrimination, and the remainder fail to raise a material issue as to whether the Authority's proffered reasons were merely a pretext for discrimination.

For example, in paragraph 20 of Murphy's amended certification, Murphy states that "Glowacki is clearly biased against [him] in light of [Glowacki's] claim ... [that Murphy] put ... his needs above th[ose] of the Authority, as opposed to his admission ... that a position for [Glowacki] was specifically created because he did not meet the Authority's residency requirements." *See* Pl. Cert., ¶ 20; *see also* Pl. Cert., ¶ 21 (consider the dubious relevance of Murphy's statement that Glowacki was paid by the Authority for his attendance at depositions, while Murphy was not). The fact that the Authority exhibited preferential treatment toward a white, male employee, namely, Glowacki, hardly bolsters Murphy's claims that the Authority discriminates against white, male employees. At best the fact is irrelevant to Murphy's claims. At worst, it supports the Defendants' position that the Authority does not engage in reverse employment discrimination.

By way of further example, Murphy alleges that "McAvaddy expressly agreed with [Murphy's] request for an increase to the mid-range of the supervising accountant title[, and that on August 9, 1995,] Glowacki admitted to me that he had met with McAvaddy and that both were in agreement that the salary judgment [Murhpy] was requesting would be made." Pl. Cert., ¶ 17. Taking the allegation as true, the statement merely proves that McAvaddy and Glowacki changed their position with regard to the salary increase before the September 28, 1995, Board of Commissioners meeting. For this Court to find that a motivating cause of this changed position was discriminatory animus would be unreasonable, particularly in light of the undisputed facts that Glowacki is of the same race and gender as Murphy, that Murphy was requesting a salary increase

that would put him on a salary level well above his immediate supervisor, Robert Lawless, and that both Glowacki and McAvaddy considered Murphy to be in line for the top accounting position in the Authority, should it become available. *See* Pl. Cert., Exh. F at 2–6; *see also* Def. Brief, Exh. D, ¶ 5.

Aside from these individual examples, the record evidence as a whole does not support the conclusion that a "factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions." *Sheridan,* 100 F.3d at 1067 (citations omitted). The evidence of record, particularly the exhibits to Murphy's certification, as well as the legal commentary [7] on these exhibits contained in the certification itself, does nothing more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.,* 475 U.S. at 586, 106 S.Ct. 1348. "[T]he mere existence of some alleged factual dispute between the parties[, however,] will not defeat [a motion for summary judgement]; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. In this case, Murhpy has failed to satisfy this requirement.

Accordingly, I find that Murphy has failed to demonstrate the existence of evidence in the record from which "a reasonable fact finder could find [the Authority's proffered nondiscriminatory reasons for the adverse employment actions] unworthy of cre-

dence[.]" *Fuentes,* 32 F.3d at 765. Therefore, I shall grant the Defendants' motion for summary judgment on Counts I, II and IV of the Amended Complaint.[8]

### B. Per Quod Causes of Action for Loss of Care, Comfort, Society and Consortium in Employment Discrimination Suits

In Count III of the Amended Complaint, Roseann Murphy claims that as a result of the Authority's adverse employment actions involving her husband, Todd Murphy, she suffered "a loss of his companionship, society, comfort, care, service and consortium...." *See* Amended Complaint, ¶ 15. Because these *per quod* damages are not cognizable in this employment discrimination action, I shall grant Defendants' motion for summary judgment on Count III of the Amended Complaint.

█ As a preliminary matter, Roseann Murphy's *per quod* claim is incidental to, dependent on, and derivative of Todd Murphy's claims of unlawful reverse employment discrimination. *See Tichenor v. Santillo,* 218 N.J.Super. 165, 173, 527 A.2d 78 (App.Div. 1987) (stating that a *"per quod* claim is only maintainable by reason of a spouse's ... injury"). A *per quod* claim "can rise no higher" than the spouse's underlying cause of action for injury. *See id.* Because I shall grant the Defendants' motion for summary judgment on Todd Murphy's underlying claims for reverse employment discrimination, it follows that summary judgment is

---

7. The Court notes that Murphy's amended certification is in clear violation of Rule 7.2(a) of the Local Civil Rules, which provides:

Affidavits shall be restricted to statements of fact within the personal knowledge of the affiant. Argument of the facts and the law shall not be contained in affidavits. Legal arguments and summations in affidavits will be disregarded by the Court and may subject the affiant to appropriate censure, sanctions or both.

L. Civ. R. 7.2(a). Out of an abundance of fairness, the Court has considered plaintiff's certification. Counsel for plaintiffs should note for future reference that violations of the Local Civil Rules of this Court may well result in the imposition of sanctions. *See e.g. Assisted Living Assocs. v. Moorestown Twp.,* 996 F.Supp. 409 (D.N.J. 1998) (Orlofsky, J.); *Romero v. Argentinas,* 834

F.Supp. 673 (D.N.J.1993); *Retter v. Georgia Gulf Corp.,* 755 F.Supp. 637 (D.N.J.1991).

8. Because I have concluded that Murphy has failed to establish a prima facie case of unlawful reverse discrimination, and, in the alternative, failed to demonstrate that the Authority's proffered nondiscriminatory reasons for the adverse employment actions were merely a pretext for invidious discrimination, I need not address the Defendants' contention that McAvaddy and Glowacki are entitled to the "same actor" defense, as defined in *DeJarnette v.Corning Inc.,* 133 F.3d 293 (4th Cir.1998). *See* Def. Brief at 12. Nor need the Court consider the disputed factual issues surrounding the timing of Murphy's EEOC complaint. *See* Def. Brief at 14; *see also* Pl. Cert., ¶ 15.

appropriate on Roseann Murphy's *per quod* claim for loss of care, comfort, society and consortium. *Cf. id.*

Furthermore, *"per quod* claims cannot be sustained under either the NJLAD, [or] Title VII...."* *Jones v. Jersey City Medical Center,* 20 F.Supp.2d 770, 773 (D.N.J.1998) (Walls, J.); *see also Catalane v. Gilian Instrument Corp.,* 271 N.J.Super. 476, 500, 638 A.2d 1341 (App.Div.1994); *accord Brown v. Youth Services Intern. of Baltimore, Inc.,* 904 F.Supp. 469 (D.Md.1995); *Dunham v. City of O'Fallon,* 945 F.Supp. 1256 (E.D.Mo.1996); *Miller v. CBC Companies, Inc.,* 908 F.Supp. 1054 (D.N.H.1995); *Doe v. R.R. Donnelley & Sons Co.,* 843 F.Supp. 1278 (S.D.Ind.1994). Accordingly, I shall grant Defendants' motion for summary judgment on Count III of the Amended Complaint.

## IV. CONCLUSION

For the reasons set forth above, I shall grant the Defendants' motion for summary judgment on Counts I, II and IV of the Amended Complaint, because Murhpy cannot establish a prima facie case of unlawful reverse employment discrimination in violation of Title VII or the NJLAD, and, in the alternative, because Murphy has failed to produce even a scintilla of evidence tending to show that the Defendants' proffered non-discriminatory reasons for the adverse employment decisions were merely a pretext for invidious discrimination. Indeed, the record in this case reveals no evidence of reverse discrimination against Murphy. On the contrary, the record evidence clearly demonstrates that Murphy was well treated and well regarded by his employer. Whatever may be the source of Murphy's unhappiness, his remedy is not with this Court.

In addition, I shall grant Defendants' motion for summary judgment on Count III of the Amended Complaint, because *per quod* claims are not cognizable in cases involving claims of employment discrimination in violation of Title VII and the NJLAD, and the underlying claim upon which it is based has been dismissed. The Court shall enter an appropriate order.

## ORDER

This matter having come before the Court on the motion of Defendants, Housing Authority and Urban Redevelopment Agency of the City of Atlantic City, John Glowacki, John J. McAvaddy, Jr., and John P. Whittington, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, Stephen G. Raymond, Esq., Charles A. Ercole, Esq., Montgomery, McCracken, Walker & Rhoads, LLP, appearing on behalf of Defendants, and Clifford L. Van Syoc, Esq., Van Syoc Law Offices, Chartered, appearing on behalf of Plaintiffs, Todd Murphy and Roseann Murphy; and,

The Court having considered the submissions of the parties, for the reasons set forth in the OPINION filed concurrently with this ORDER;

IT IS, on this 27th day of January, 1999, hereby ORDERED that the motion of Defendants, Housing Authority and Urban Redevelopment Agency of the City of Atlantic City, John Glowacki; John J. McAvaddy, Jr., and John P. Whittington, for summary judgment on all counts of the Amended Complaint is GRANTED.